FORD MOTOR COMPANY, a
corporation, Plaintiff,

v.

AUTO SUPPLY COMPANY, INC.,
Harold H. Karp and Maurine E.
Karp, Defendants.

Civ. No. 76–0–300.

United States District Court,
D. Nebraska.

Sept. 5, 1978.

Lyle E. Strom, Omaha, Neb., for plaintiff.

William G. Campbell, Lindsey Miller Lerman, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

Plaintiff, Ford Motor Company, brought this lawsuit to recover money it claims to be due from defendants following termination of the direct account sales agreement between the parties. The matter was tried to this Court sitting without a jury and is now ready for disposition.

Plaintiff, Ford Motor Company, is a corporation incorporated under the laws of the State of Delaware and has its principal place of business in a state other than Nebraska. Defendant, Auto Supply Company, Inc., is a corporation organized and existing by virtue of the laws of the State of Nebraska with its principal place of business in Omaha, Nebraska. Defendant Harold H. Karp is a citizen of the State of Nebraska and is president, director and chairman of defendant Auto Supply Company. Defendant Maurine K. Karp is a citizen of the State of Nebraska and is vice president, secretary, director and shareholder of Auto Supply Company, Inc. The amount in controversy in this action exceeds the sum of $10,000. Jurisdiction of this Court is based on 28 U.S.C. § 1332. This memorandum constitutes the Court's findings of fact and conclusions of law.

Plaintiff, Ford Motor Company (hereafter Ford) manufactures and sells motor vehicles and parts therefor. Eleven lines of parts, supplies and accessories are either manufactured by Ford or to its specifications. Along with various other channels of distribution, Ford sells these parts to direct accounts which are independent companies contractually authorized to buy and sell such parts. Defendant Auto Supply Company (hereafter Auto Supply) entered into a direct account sales agreement with Ford on May 9, 1969, entitling it to purchase Ford parts directly and resell them. In Ford's parts distribution system, Auto Supply was classified as a warehouse distributor (WD). Warehouse distributors in turn sell Ford parts primarily to wholesalers, fleet accounts and government accounts. If Ford is satisfied that wholesalers are in fact reselling parts primarily at wholesale to retail outlets, the wholesaler is eligible to become a recorded wholesaler.

The various levels of distribution of Ford parts are reflected not only in the flow of

those parts from the manufacturer to the consumer but also in Ford's pricing system. Ford's published price list states the regular price to a wholesaler. A warehouse distributor automatically receives ten per cent off of this price on all purchases. Warehouse distributors are also entitled to receive a discount known as a redistribution allowance for sales to recorded wholesalers, fleet or government accounts. The amount of this redistribution allowance varies with the percentage of sales of the warehouse distributor to recorded wholesalers, as indicated by an affidavit of sales redistribution filed periodically with Ford, and with the redistribution allowance factor assigned for the particular product line. In addition to redistribution allowances, a warehouse distributor is entitled to an additional rebate known as a recompensation allowance upon submission of documentation indicating that products sold by the warehouse distributor to a recorded wholesaler are subsequently sold to a fleet or government account.

Defendant Harold Karp had for several years been involved in the automotive parts business in Council Bluffs, Iowa, doing business as H. K. Auto Supply, Inc. (hereafter H. K.). H. K. Auto Supply, Inc., was a wholesaler of various brands of parts and supplies, including plaintiff's products. In 1969 Mr. Karp established a new business known as Auto Supply Company, Inc., which entered into the direct account sales agreement with plaintiff as mentioned above. At the time that Auto Supply entered into this agreement, a security agreement was executed on behalf of the corporation in which Harold and Maurine Karp, husband and wife, provided a personal surety agreement guaranteeing Auto Supply's account with Ford. The Karps wished to have H. K. approved as a recorded wholesaler, thus enabling Auto Supply to receive redistribution allowances for sales from Auto Supply to H. K. Such approval was available under the policies and procedures established by Ford provided the warehouse distributor, Auto Supply, executed an affidavit of affiliation describing the relationship between the two companies and assuring that the two companies would be operated as independent businesses. Such an affidavit was first submitted July 8, 1969, and resubmitted May 10, 1971, and March 19, 1973.

Auto Supply purchased parts, supplies and accessories from Ford and resold them to various wholesalers, including H. K., during the period from May, 1969, through August, 1975, receiving redistribution and recompensation allowances. In July, 1975, Ford conducted a routine audit of Auto Supply, as permitted under the terms of the direct account sales agreement, which stated:

> To assure the Company that Direct Account is carrying out the provisions of this Agreement, Direct Account shall permit persons designated by the Company, at reasonable times and intervals during normal business hours, to examine Direct Account's records, contracts and accounts relating to, or including any data relating to, the sale or servicing of Autolite-Ford parts. Direct Account shall retain for at least two years all records, contracts and accounts upon which claims to the company for refund, credit, rebate, incentive, allowance, discount, reimbursement or other payment of any kind have been made.

This audit included verification of Auto Supply's reports to Ford, the affidavit of affiliation and the books and records of the direct account.

As a result of the audit, Ford determined that there existed violations of the provisions of the affidavit of affiliation regarding maintenance of separate business operations between Auto Supply and H. K. Having made this determination Ford concluded that H. K. was not eligible for recorded wholesaler status and sought to recover the redistribution and recompensation allowances paid to Auto Supply on sales to H. K. In an effort to reduce the amount of this recovery, Ford offered and defendants ultimately agreed to extend the audit so as to consider Auto Supply and H. K. as one entity, thus permitting the one entity to receive any discounts allowable on sales

from either of the entities to other recorded wholesalers. The audit balances were modified, the audit extended to include an additional two years, and a final charge-back determined. The direct account sales agreement was terminated and inventory in the possession of the direct account returned to Ford. After offsetting the credit for returned inventory against the amount of the charge-back resulting from the audit, Ford demanded payment and now brings suit to recover a claimed outstanding balance of $465,475.42, plus interest.

Defendants contend that no violations of the affidavits of affiliation exist, that the charge-backs for disallowed discounts are improper, that defendant is estopped from making such charge-backs, and that the amounts of the charge-backs claimed are excessive.

■ Turning first to the basis upon which Ford determined that sales to H. K. were not eligible for redistribution or recompensation allowances, the Court must determine whether Auto Supply and H. K. were being operated as separate business entities. Each affidavit of affiliation executed by Auto Supply stated that although Auto Supply and H. K. were affiliated by virtue of ownership of the stock of both by Harold Karp and Maurine Karp, the two companies were independent of each other in the following respects, among others:

a) That there were no common officers or directors;

b) Separate inventory and accounting records were maintained;

c) Separate facilities, inventories and employees were used;

d) The financial affairs of the two companies were separately maintained, including the fact that the companies did not share credit or expenses, and that separate bank accounts were maintained and independently controlled by the two companies;

e) The affiliate was not required to and did not deal exclusively with the wholesale distributor; and

f) No disparate treatment existed between the affiliate and other customers of the warehouse distributor in terms, sales, deliveries, etc.

Auto Supply further certified that less than seventy-five per cent of its sales were made to its affiliates while more than twenty-five per cent of its sales were made to non-affiliates (the so-called seventy-five/twenty-five rule). Finally, Auto Supply agreed to promptly inform plaintiff in writing of any changes in the operations of the two companies which might effect any of the areas covered by the affidavit of affiliation. On the basis of the information contained in this affidavit of affiliation, H. K. was approved as a recorded wholesaler of Auto Supply entitling Auto Supply to the appropriate discounts.

The evidence presented clearly supports plaintiff's contention that during the period covered by the audit, the operations of Auto Supply and H. K. were not in conformity with several conditions set out in the affidavit of affiliation. These violations of the affidavit included the fact that withdrawals from bank accounts of both Auto Supply and H. K. could be made only on the signature of Harold or Maurine Karp, the fact that employees of the two companies were routinely assigned to and performed duties for both companies, the fact that both companies used a common inventory, and the fact that sales to H. K. exceeded seventy-five per cent of Auto Supply's gross sales of Ford products.

The signature cards for checking accounts of both Auto Supply and H. K. indicate that only Harold and Maurine Karp were authorized to sign checks on behalf of either company. The testimony disclosed that in fact checks for both companies were signed by Harold Karp with a rubber stamp indicating "Mrs. Harold H. Karp." Thus, the evidence supports the conclusion that the finances of both companies were effectively under the control of the same persons.

Auto Supply had five persons on its payroll, including Harold and Maurine Karp. Only one of these employees actually worked in the Auto Supply office. H. K.

employed fifteen individuals, four of whom worked at the Auto Supply location. All employees of each company were under the direct supervision of Harold Karp. The duties performed by many of the employees bore little or no relationship to which payroll they were on. For example, orders were packaged and shipped for both companies by H. K. employees. Auto Supply employed no warehouse or delivery personnel, but rather used H. K. employees. Harold Karp admitted at the time of the post-audit conference on August 25, 1975, that employees worked for both companies irrespective of their nominal employer. This evidence adequately supports the conclusion that the warehouse distributor and its affiliate shared employees.

Ford's auditor testified that he observed no open inventory of Ford parts at the H. K. warehouse. Merchandise sold by either company apparently came from the Auto Supply warehouse. The end of fiscal year inventories for H. K. in 1973 and in 1974 did not show any Ford-made parts despite the fact that H. K. purchased over one and a half million dollars in Ford parts from Auto Supply during fiscal year 1974.

Defendants do not seriously dispute these findings, contending that such practices were necessary to cut costs in order to remain competitive. The principal dispute between the parties involves the finding that the so-called seventy-five/twenty-five rule had been violated. The affidavit of affiliation states in part:

. . . Distributor does not limit its Motorcraft and Autolite wholesale parts sales effort solely to affiliates and is engaged in a continuing effort to develop its wholesale parts sales to non-affiliates and that, at present, its sales to such non-affiliated wholesalers and fleets account for at least twenty-five percent of distributor's total Motorcraft and Autolite parts sales to wholesalers, fleets and governments.

The evidence indicates that this requirement was not being met on a regular basis. Harold Karp testified that Auto Supply's records for the period from April, 1973, to September, 1975, show that sales of Ford parts to H. K. exceeded seventy-five per cent of Auto Supply's total Ford parts sales in June, September, October and November of 1974, and in January, March and June of 1975. In addition, Ford's auditor discovered that $1,527,750 of Auto Supply's sales, listed as having been made to wholesale accounts designated by the suffix "A.L." [i. e., Lyle's Auto-A.L.] were in fact made to H. K., thus increasing the total sales to H. K. beyond the amount reflected on Auto Supply's books. When confronted with the information regarding the A.L. accounts at the post-audit conference, Harold Karp admitted having established these paper accounts in an effort to comply with the seventy-five/twenty-five rule.

Sales to H. K. through the A.L. accounts were accomplished by issuing invoices from Auto Supply to an A.L. account who was unaware of the entire transaction, having H. K. Auto issue a check to the A.L. account for the invoice price, which was then endorsed over to Auto Supply by Harold Karp on behalf of the A.L. account to cover the invoice. H. K. in turn sold the parts to its customer, received payment and had the parts shipped directly from the Auto Supply warehouse to H. K.'s customer. The net effect of these transactions was to enable Auto Supply to claim a redistribution allowance for sales made through H. K. to non-recorded wholesalers, despite the fact that such sales to H. K. initially would put the total sales volume farther in excess of seventy-five per cent of Auto Supply's volume.

Thus, the evidence clearly reveals several major discrepancies between the description of the affiliation between Auto Supply and H. K. and supports the conclusion that the required independence was not being maintained. In fact the two companies were simply different facets of the same business rather than serving two separate functions in Ford's distribution system.

Defendants contend that the alleged violations of the terms of the affidavit of affiliation do not justify disallowance and charge-back by Ford of erroneously paid

discounts since such charge-backs are not authorized by the agreement of the parties. This contention must be resolved by reference to the documents encompassing the agreement between the parties. It is fundamental that, in interpreting such documents, the courts must endeavor to effectuate the true intent of the parties by construing the contract in such a way as to give meaning to all parts thereof consistent with each other, giving the words of the parties their plain and ordinary meaning. *See Beister v. John Hancock Mutual Life Ins. Co.*, 356 F.2d 634 (8th Cir. 1966).

The standard provisions of the direct account sales agreement provide that Ford will set prices to be charged to wholesale distributors for its parts, which prices are subject to change without prior notice, and include the following clause:

> The Company (Ford) may from time to time establish redistribution allowances, or such other types of allowances as the Company determines necessary to remain fully competitive, to be allowed Direct Account for sales by Direct Account to certain types of accounts specified by the Company. A description of such allowances, the qualifications of eligible accounts, the method of submitting claims therefor and the manner of payment by the Company will be contained in the Autolite-Ford Policy and Procedure Manual.

The Policy and Procedure Manual contains a section known as Bulletin 900 which sets forth Ford policies regarding redistribution and recompensation allowances. Although the format of Bulletin 900 has been periodically revised, since at least December of 1968 this bulletin has provided substantially as follows:

> . . . Redistribution may be paid on sales by direct accounts to affiliated wholesalers under certain conditions. If an affiliation exists between the direct account and the wholesaler, an affidavit must be executed describing certain conditions that may exist for each such affiliation and a copy of the affidavit provided Autolite-Ford parts division . . . ..

> *If any such conditions exist, redistribution will not be paid.* . . .

Autolite direct account shall prepare, keep up to date and retain for a minimum period of two (2) years the following submission of each claim for redistribution compensation, all such records as Autolite-Ford parts division shall deem necessary for complete verification by Autolite-Ford parts division of the validity of such claim . . . .. Such records shall be subject to examination and audit by representatives of Autolite-Ford parts division at Autolite Direct Account's place of business at all reasonable times during regular working hours. *All claims for redistribution compensation,* whether pending or previously paid, must be supported by such records of the direct account and *are subject to disallowance or charge-back to the direct account if not appropriately supported by direct account records.* Any previous payment by the Autolite-Ford parts division will not be deemed as a waiver.

Additionally, with respect to wholesalers' claims for recompensation allowances for sales of Autolite-Ford parts to approved and recorded fleet and government accounts, the direct account certifies each month . . . that the wholesalers, claiming such recompensation allowances have agreed to make available for audit by an accredited Autolite-Ford representative their complete records pertaining to such claims for a minimum period of two years. *The direct account also agrees to accept any adjustment resulting from the audit of any of his wholesalers' records.* (Emphasis added.)

Ford determined from an examination of the records of Auto Supply and from observation of Auto Supply's method of doing business that redistribution allowances had been improperly allowed on sales to H. K. Ford, therefore, sought to recoup the improperly paid discounts by debiting or charging back those amounts as authorized under the Policy and Procedure Manual provisions incorporated by reference into

the direct account sales agreement. Ford was acting within its rights under the agreement between the parties in attempting to recoup these amounts.

 Defendants contend that even if Auto Supply was not maintaining the required independence from its affiliate and the terms of the agreement between the parties authorized charge-backs for disallowed discounts, plaintiff is estopped from making any charge-backs in this case. Defendants contend in essence that plaintiff was aware of Auto Supply's method of doing business and that plaintiff permitted Auto Supply to continue to operate in the same manner, thereby creating an inference that Auto Supply's operations were sanctioned by plaintiff. Defendants contend that other factors unrelated to this lawsuit in fact motivated Ford to reverse its prior position and attempt to penalize defendants by disallowing the discounts previously granted. Defendants make their estoppel argument on the basis of (a) an audit report issued in 1971 which indicated that some Ford employees felt there was a possibility of unified management of the wholesale distributor and its affiliate; (b) certain forms submitted monthly to Ford seeking discounts on three lines of parts from which Ford could allegedly have determined that the seventy-five/twenty-five rule was being violated; and (c) regular visits by a Ford employee from the Omaha district office to Auto Supply's business by which plaintiff allegedly could have known of the conditions now termed a breach of the affidavit of affiliation.

With respect to Ford's knowledge in 1971 of the degree of managerial control by Auto Supply over its affiliate, the audit work papers from the 1975 audit introduced into evidence do contain an inter-office memorandum dated May 25, 1971, which states in part:

> Because of an apparent degree of managerial control by the distributor over his affiliate, H. K. Auto Supply, Inc., and the relative physical closeness of both businesses, a review of the distributor-affiliate relationship should be made to determine compliance with Autolite-Ford redistribution compensation policies.

However, no evidence was introduced by either party indicating what actions, if any, were taken as a result of this memorandum. The defendant did execute an affidavit of affiliation on May 10, 1971, but the relationship, if any, between those two documents, or whether the affidavit was subsequently verified, is unknown.

The monthly forms submitted by Auto Supply to Ford were used to report, by wholesaler, the aggregate sales of sparkplugs and tuneup kits eligible for redistribution allowances and the sales of sparkplugs, batteries and filters by wholesalers to fleets and government accounts for which recompensation allowances were claimed. No reference is made on these forms to the relationship if any between the warehouse distributor and the various wholesalers listed. The forms were not used by Ford to determine whether a warehouse distributor sold in excess of seventy-five per cent of all his Ford products to affiliates, but only to report sales of specific lines of Ford products. Thus a report showing a particular percentage of a month's sparkplug and tuneup kit sales to affiliates would not necessarily indicate compliance with the seventy-five/twenty-five rule since the report does not take into account sales of other lines nor in this case do the reports reflect accurately the sales to H. K. through the A.L. accounts.

Ford's zone manager, who called on Auto Supply, testified that he dealt only with Auto Supply, usually through Harold Karp, and that he was unaware of any violations of the affidavit of affiliation prior to their discovery in the Ford audit. This testimony is not inconsistent with the audit findings since the nature of the violations would preclude discovery in the absence of an examination of defendant's books and records as well as physical inspection of the facilities of both the warehouse distributor and its affiliate.

The foregoing facts, whether considered individually or in the aggregate, are not sufficient to raise a defense of estoppel. As

the Nebraska Supreme Court recognized in *Chappelear v. Grange and Farmers Insurance Company*, 190 Neb. 589, 210 N.W.2d 921 (1973):

> The essential elements of equitable estoppel are: As to the party estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the parties subsequently attempt to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other person; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice. . . . A party may not properly base a claim of estoppel in his favor on his own wrongful act or dereliction of duty, or fraud committed or participated in by him, or on acts or omissions induced by his own conduct, concealment, or representations. (Citations omitted.)

190 Neb. at 592, 210 N.W.2d at 924. Defendants have not shown that they were misled by Ford to their detriment, nor that they were unaware of the requirements regarding sales to affiliates and their violation of those requirements. Thus, defendants have failed to establish that plaintiff should be estopped from claiming violations of the affidavit of affiliation or from disallowing discounts erroneously paid.

█ Defendants also contend that the charge-backs are improperly computed. While the integrity of the audit conducted by Ford employees is unimpeached, defendants contend that the time period covered and the items included are overly broad. Defendants contend that Ford is precluded from making any charge-backs prior to April of 1974 because audits were conducted by Ford in 1971 and 1974. Since the total fifty-two month period covered by the two phases of Ford's 1975 audit begins in May, 1971, the February, 1971, audit has no bearing on this lawsuit. The 1974 adjustments arose as a result of the discovery that Auto Supply was claiming recompensation allowances for sales by H. K. to an ineligible fleet account. A complete audit of Auto Supply was not conducted as the only item in controversy at the time was this series of sales to the fleet account. Contrary to defendant's argument, the 1974 charge-back to which defendants had agreed, does not constitute an account stated, thus precluding reconsideration of any transactions on Auto Supply's account prior to that time.

> An account stated is an agreement, express or implied, between the parties, who have had previous transactions with each other, fixing and determining the amount due from one to the other. . . . In creating an account stated, the minds of the parties thereto must meet and understand that a final adjustment of the respective demands of each upon the other is being made. (Citations omitted.)

*Hansen v. Abbott*, 187 Neb. 248, 250, 188 N.W.2d 717, 718–19 (1971).

From the evidence presented, this Court has no basis to conclude that the 1974 adjustments were ever intended to or did in fact encompass a review of all the transactions between the parties, nor to result in a final adjustment in the account to that date. Rather, the adjustment was apparently designed to correct an error in a single series of transactions without considering any other transactions between the parties. Since there is no evidence that this 1974 charge-back was duplicated in the 1975 audit, it has no relevance to the 1975 audit results.

The 1975 audit was conducted in two stages. Upon completion of Phase I, Ford correctly determined that the required separation between Auto Supply and its affiliate was not being maintained and that sales from Auto Supply to its affiliate were not

956

eligible for redistribution allowances. Based on a four-month sample, Ford's auditor determined that 81.1 per cent of Auto Supply's sales had in fact been made to its affiliate and recommended that this same percentage of Auto Supply's redistribution allowance for the audit period be charged back. The audit recognized that sales invoiced to H. K. and to the A. L. accounts were actually made to the affiliate. The percentage was determined by compiling a sample of sales for the entire months of July, 1974, October, 1974, January, 1975 and April, 1975. The sales made in these months to H. K. were then compared to the total sales of Auto Supply for the months and the 81.1 per cent factor was arrived at. This sampling procedure was recommended and ordinarily practiced by the Ford audit department.

▉ The sampling results were verified by comparing the sales to A.L. accounts weighted for a twenty-four month period under the sample technique to actual sales to identify A.L. accounts for the same twenty-four month period. Actual sales exceeded the amount projected by the sample, indicating that the sample results reflected a sales ratio less than the actual experience of Auto Supply. From this evidence the Court concludes that Ford properly determined 81 per cent of the redistribution allowances claimed by Auto Supply during the audit period were improper and subject to charge-back.

▉ Any recompensation allowances paid to Auto Supply for sales by H. K. were also properly charged back. Auto Supply was not eligible for such allowances since only sales by validly recorded wholesalers qualified for recompensation allowances. H. K. was determined not to be a recordable wholesaler in view of its affiliation with Auto Supply and thus did not meet this requirement.

In an effort to reduce the amount of the charge-backs, Ford offered to combine Auto Supply and H. K., treating the two entities as a single direct account, which would have been eligible for redistribution and recompensation allowances on sales to other re-corded wholesalers. Such an account was commonly referred to as a redistributing wholesaler. After some vacillation, Harold Karp agreed to permit this combination and made available the records of H. K. as well as those of Auto Supply. Phase II of the audit was then conducted, using this combination, which adjustments reduced the total gross charge-back, $633,303, to $550,408. These combination adjustments were the result of Ford's recognizing all sales by either Auto Supply or H. K. to recorded or recordable wholesalers and charging back only the discounts paid in excess of those amounts.

▉ In Phase II of the audit, Ford also extended the audit period back an additional twenty-six months applying the same percentage derived in the first part of Phase II and issued a total charge-back of $951,753, which included the $550,408, supra, or an additional amount of $401,345. No explanation was presented as to the reason for this extension to cover the period from May, 1971, through June, 1973. Nor was any evidence presented from which the Court can conclude that redistribution and recompensation allowances were improperly granted for this period. The evidence regarding violations of the terms of the affidavits of affiliation was derived from the first phase of the audit and applies only to the time period covered by that audit. Therefore, the Court concludes that Ford's right to an additional charge-back of $401,-345 for the period from May 1, 1971, through June 30, 1973, is not supported by the evidence and must be disallowed.

Auto Supply owed Ford $645,885 on open account at the time of the termination of the direct account sales agreement. In addition, Ford properly charged back $550,408 for redistribution and recompensation allowances improperly claimed by Auto Supply. Auto Supply thereafter returned for credit parts valued at $1,112,698. Thus there remains an outstanding balance of $83,595 due Ford, for which amount Ford is entitled to judgment against Auto Supply.

▉ At the time Auto Supply entered into the direct account sales agreement

with Ford, Harold and Maurine Karp executed a personal surety agreement, supra at page 2, unconditionally guaranteeing payment of any Auto Supply indebtedness to Ford which was the result of transactions anticipated under the direct account sales agreement. The liability of Auto Supply for a balance due to plaintiff on its account for improperly claimed discounts is a liability incompassed by the surety agreement since the disallowance of claimed discounts results in the full purchase price not having been paid for all purchases. Accordingly, plaintiff is entitled to judgment in the said amount of $83,595 against Harold and Maurine Karp individually on the basis of the surety agreement.

A separate order herein, according to this memorandum opinion, will not be entered until such time as the parties are heard with reference to attorney fees and prejudgment interest (as to whether the same is allowable here and, if so, in what amount).

To that end, if the parties are unable to agree and stipulate as to these items, without prejudice to their respective rights to appeal, within ten (10) days from date hereof, they shall so notify this Court so that a hearing date may be scheduled and the matter presented to the Court for determination.