**FORD MOTOR COMPANY, A Corporation, Appellee,**

v.

**AUTO SUPPLY COMPANY, INC.; H. K. Auto Supply, Inc.; and Harold H. Karp, Appellants.**

**AAA Business Forms and Systems, Inc.**

**No. 80–2171.**

United States Court of Appeals, Eighth Circuit.

Submitted July 23, 1981.

Decided Oct. 14, 1981.

Rehearing Denied Nov. 10, 1981.

Lindsey Miller-Lerman (argued), Kutak, Rock & Huie, Omaha, Neb., for appellants.

Lyle E. Strom (argued), Bruce D. Vosburg, Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., William A. Zolbert, Dearborn, Mich., for appellee.

Before LAY, Chief Judge, and STEPHENSON and McMILLIAN, Circuit Judges.

STEPHENSON, Circuit Judge.

The district court,[1] after a bench trial, ordered a $3.6 million judgment in favor of the plaintiff Ford Motor Co. based on the defendants' trademark and copyright infringement. On appeal the defendants raise two issues. First, they claim that the district court abused its discretion in refusing to allow the defendants to amend their answer to raise additional defenses following the entry of summary judgment. Second, they claim that exhibit 30, which was principally relied upon to arrive at the amount of damages, lacked proper foundation. We disagree with the appellants' contentions and affirm the district court.

## I. BACKGROUND

The original complaint in this case was filed in October 1975. Ford Motor alleged, and the district court held, that defendants Harold H. Karp, H. K. Auto Supply, Inc. and Auto Supply Company, Inc. willfully and unlawfully traded upon the goodwill and reputation of Ford in the sale of certain automotive parts.[2] The district court found

---

1. The Honorable Albert Schatz, United States District Judge for Nebraska, presiding.

 An unrelated case involving the same parties is reported at *Ford Motor Co. v. Auto Supply Co., Inc.*, 480 F.Supp. 947 (D.Neb.1978), *aff'd in part and rev'd in part*, 615 F.2d 757 (8th Cir. 1980).

2. The district court summarized its findings and conclusions as follows:

 [D]efendant Karp, operating through H. K. Auto Supply Company, purchased auto parts which did not contain the trademarks at issue at the time of purchase, caused the trademarks to be [stamped and packaged in boxes] with the trademarks and copyrighted designs at issue, and distributed the packaged parts throughout the country. Defendant Karp has not refuted plaintiff's showing that the parts were marked with substantially

that Karp, acting through H. K. Auto Supply and Auto Supply Company, engaged in a deliberate, persistent and knowingly fraudulent scheme whereby unmarked automotive parts were purchased from third-party suppliers, stamped with Ford's registered trademarks MOTORCRAFT and FORD and then packaged in boxes bearing Ford's copyrighted art work and color schemes. The boxes were substantially identical to the official Ford packaging.[3]

The district court, in a partial summary judgment entered in September 1977, concluded that the defendants were liable under 15 U.S.C. § 1114 for trademark infringement, 15 U.S.C. § 1125 for false designation of origin, 17 U.S.C. § 501 for copyright infringement and Neb.Rev.Stat. § 87–302 for unfair business practices. After a hearing on damages the district court entered a final judgment in November 1980. Based upon exhibit 30, actual damages were found to be $1.7 million. This amount was doubled under 15 U.S.C. § 1117. Attorneys' fees of $200,000 were also awarded. The total judgment entered was $3.6 million. The district court also granted a permanent injunction against the defendants to prevent further violations of Ford's trademarks and copyrights.

## II. ISSUES AND DISCUSSION [4]

### A. *Exhibit 30*

The most difficult issue raised by the appellants is the admission of exhibit 30. They claim that this exhibit lacked foundation and therefore was improperly relied upon to ascertain the amount of damages.[5]

The district court held that the proper measure of actual damages was the incremental profit Ford would have made if the sales lost to the defendant had actually been made by Ford.[6]

---

identical reproductions of Ford trademarks and sold in commerce as genuine Ford products without the permission of Ford Motor Company. Defendant Karp's only contention is that the parts were purchased from the same suppliers which sell parts to plaintiff and thus could not be categorized as counterfeit parts likely to cause confusion among retail customers as to either quality or source of origin.

\* \* \* \* \* \*

Where defendant without permission and without justification marks similar products with plaintiff's trademark and sells the product as plaintiff's product, defendant has violated the trademark law by falsely designating the product's origin. Defendant is engaged in a fraudulent course of conduct which is an unfair competition with plaintiff for the market of plaintiff's products. Defendant is, in other words, passing off goods purchased by him from third parties as goods purchased from plaintiff. That defendant Karp's activities are likely to result in confusion among the members of the public seeking to purchase plaintiff's products (the gravamen of an infringement action) can hardly be denied where plaintiff's product and defendant's product bearing plaintiff's trademark are virtually identical in appearance and are sold in competition with each other.

3. The parts which are the subject matter of this suit are two ignition point sets, a fuel filter set, a starter drive and a condenser set.

4. It is important to note what this case is not about. The appellants do not raise the issue of whether entry of the summary judgment was proper nor do they question the doubling of damages under 15 U.S.C. § 1117. They only request review concerning whether Ford carried its burden of proving damages (focusing on the admission of exhibit 30) and the district court's refusal to allow leave to amend their answer after the entry of summary judgment on the liability issue. We also note that the appellants do not raise the specific issue of whether it was proper for the district court to base damages on "incremental profit" as opposed to "fully accounted profit." Nevertheless, after an examination of the record, we have determined that it was not error to use this approach under the circumstances in this case.

5. The precise contents of exhibit 30 and of much of the supporting material is under a protective order to prevent making this information public. We have examined the document and the "back up" material and conclude that it is not necessary to list the specific figures given in the exhibit. We also note that at oral argument counsel for the defendants agreed that the numbers carried over from the supporting documents were arithmetically correct without, of course, conceding that there was sufficient foundation for the exhibit or that the concept underlying the summary was reasonable.

6. The district court discussed the defendants' theory for measure of damages as follows.

Defendants claim that the proper measure of damages is reflected by what defendants

In summary, exhibit 30 is a single sheet statement of sales and costs of the five specific parts involved in this litigation for the years 1972–1975. It lists the number of units sold by the defendants. Using that number the plaintiffs applied prices charged by Ford Motor to arrive at gross sales. The remainder of the exhibit lists variable costs such as dealer discounts and material costs. Certain fixed costs such as managerial salaries and warehouse maintenance costs are not part of the calculation. The variable costs, which Ford would have incurred had they been able to make these additional sales, were subtracted from gross sales. The above fixed cost, which Ford would have extended regardless of the additional sales, were not deducted.

The exact scheme of exhibit 30 is as follows. The number of units sold by the defendants and the prices that Ford was charging in the relevant period were used to arrive at gross sales. Ford then subtracted costs from four categories to arrive at a lost profit figure for each product for each year. Ford subtracted revenue deductions (parts returned by dealers, trade discounts and promotional costs), material costs (actual cost of the parts), variable depot in/outbound freight charges (shipping and handling costs) and direct fixed costs (inventory losses resulting from theft, bookkeeping or shipping errors, and costs of scrapping obsolete parts).[7] Certain fixed costs, which the exhibit designates as indirect fixed costs, were not subtracted from gross sales to determine lost profit. Examples of this type of expense are warehouse rental and salaries. These were excluded on the theory that these costs would not have varied where there was only a small increment in sales.

Terrence Marrs, manager of the financial analysis department of the parts and service division of Ford Motor, prepared exhibit 30. Marrs testified in detail concerning the origin of the figures and summary. The major source for the material is what is called the Product Line Profitability Analysis (PLPA). The PLPA is prepared annually by Ford and compiles the performance of Ford parts by product line. For example, four of the products in question were included in the electrical products line and the fifth was part of the filter product line.[8]

term Ford's "fully accounted profit." That value would attribute to the lost sales and deduct from the resulting profit a pro rata share of Ford's fixed costs. It is that value, defendants claim, that Ford would have reflected in its profit statement had the sales actually been made. While that is true, the Court rejects the defendants' line of reasoning since it overlooks the fact that, had the lost sales been added to the total sales, the portion of Ford's fixed costs attributed to actual sales would also have been proportionately less, such that the total net profit would be the same as that derived from adding Ford's incremental value to profits actually made.

7. One other adjustment was made. A category entitled "other variable" was listed and represents a reduction in the first category of costs, revenue deductions. The revenue deductions included an allowance for returned parts. Once the parts are returned to Ford, the allowance is reduced to reflect the returned products. The "other variable" category represents an adjustment for these returned products.

8. Ford does not record profits for each product but keeps figures for each product line, e. g., electrical products as opposed to records for each condenser or starter drive product. In this case, the parts in question made up only a fraction of the relevant product line. In order to arrive at specific costs for each part, Marrs testified that he used the percentage that each cost represented of gross sales for the entire product line. He then calculated that percentage of each product's gross sales to arrive at a cost figure for that particular part. For example, if freight and handling expense amounted to about six percent of gross sales for electrical products, then freight and handling costs were assumed to be six percent of the gross sales of starter drives. Thus, Marrs used the average cost of the entire product line to ascertain the cost for each specific part.

Exhibit 30 follows this general approach with several exceptions. The number of units reflect the number of each product actually sold by the defendants during the relevant periods. The gross sales figures are based on prices actually charged by Ford Motor. Material cost represents the actual cost that would have been incurred if Ford had purchased these parts and had made the sales appropriated by the defendants. The remainder of the figures used to reach the lost profits are taken from the PLPA and were adapted in the method described above.

Marrs testified that the PLPA were prepared in the ordinary course of business and were compiled each year to aid Ford in making decisions concerning pricing and purchasing. He stated that the PLPA were based on "actuals," the detailed accounting statements compiled on an on-going basis. Thus, the PLPAs are summaries of the "actuals" and were prepared at the close of each year. Marrs also testified that he did not prepare the PLPAs nor was he the custodian for these financial statements at the time they were prepared.[9] The PLPAs and other "back up" material were not offered into evidence but were available in the court room.

The defendants-appellees argue that exhibit 30 was inadmissible because it is a summary of a summary, none of which contained original entries kept in the ordinary course of business and because it was based on records not prepared by the witness through whom it was offered.

There are two rules which govern this issue: Rules 803(6), 1006 Fed.R.Evid. Rule 1006 states that the contents of voluminous writings which cannot be conveniently examined in court may be presented in the form of a summary or calculation. The rule also states that the "originals" shall be made available for examination at a reasonable time and place, and that the court may order that they be produced during trial.

Rule 803(6) provides as follows:

The following are not excluded by the hearsay rule * * *:

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Fed.R.Evid.

 Rule 1006 clearly permits the use of a summary such as exhibit 30.[10] The issue here is whether the summary is based on admissible evidence, i. e., the PLPAs. A summary, if drawn from data that is inadmissible, likewise must be excluded. *See Phillips v. United States*, 201 F. 259, 269 (8th Cir. 1912). *See also United States v. Johnson*, 594 F.2d 1253, 1255–57 (9th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979); 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 1006[03] (1978).

The question of whether the PLPAs are admissible and therefore a proper source for the exhibit 30 summary can be answered by rule 803(6). That rule allows admission of a record or data compilation, in any form, of events made at or near the time by a person with knowledge *if* kept in the course of a regularly conducted business activity and *if* it was the regular practice of that business to make the data compilation. This showing is required to be made by the custodian or other qualified witness.

 By its terms rule 803(6) encompasses the PLPA. They are a record or data compilation made at the end of the business

---

**9.** There can be no serious dispute concerning the remaining sources for the information contained in exhibit 30. These figures represent easily ascertainable quantities or are based on substantial record evidence. *See* n.8, *supra*.

**10.** Exhibit 30 is based on, among other items, the PLPAs which are sixty column "spread sheets" compiling a large amount of complex data for each of four years. This is clearly the kind of "voluminous writings" that the drafters of the federal rules anticipated when they allowed a summary to be admissible. *Cf. Javelin Inv., S.A. v. Ponce*, 645 F.2d 92, 96 (1st Cir. 1981) (ten documents, all simple and straightforward, were not the type which cannot conveniently be examined in court).

year. Marrs testified, and it is undisputed, that the PLPAs were kept in the course of regularly conducted business and that it was an annual practice to prepare these financial statements. Further, the rule expressly permits these elements to be shown by a "qualified witness" as opposed to the custodian. Marrs, as manager of the financial analysis department, was certainly a qualified witness. *See United States v. Page*, 544 F.2d 982, 987 (8th Cir. 1976). *See also United States v. Colyer*, 571 F.2d 941, 947 (5th Cir.), *cert. denied*, 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978); *United States v. Rose*, 562 F.2d 409, 410 (7th Cir. 1977).[11]

We conclude that there was proper foundation for exhibit 30 and, therefore, that it was not an abuse of discretion for the district court to admit and rely upon this exhibit.[12]

B. *Amendment After Summary Judgment*

■ Summary judgment on the liability issue in this case was entered on September 8, 1977. On September 23, 1977, defendants H. K. Auto Supply, Inc. and Auto Supply Company, Inc. purchased the right to use an unregistered trademark MOTORCRAFT PRODUCTS from a Stewart Armstrong. By deposition, Armstrong maintained that he had commenced use of the mark in 1944, which would predate Ford's registration of its mark by about seventeen years. The defendants then filed a motion seeking to amend their answer referring to this purchase and making the claim that they had stepped into the shoes of the prior user and, thus, could not be held liable for infringing

any rights Ford may have had in the same mark. They sought to vacate the summary judgment and preliminary injunction as well as injecting a counterclaim to establish their priority to the mark in question. The district court, while recognizing the usual liberal application of Rule 15, Fed.R.Civ.P., held as follows.

[T]his Court cannot ignore the context in which the "new facts" now sought to be added arose. Faced with certain liability for their fraudulent conduct, the defendants, in little more than two weeks following entry of summary judgment, located an individual who previously used the name MOTORCRAFT PRODUCTS in connection with his business and purchased for $10,000 his entire inventory, good will and trademark rights. Under the circumstances, this Court agrees with Ford's characterization of that transaction as a transparent attempt on the part of the defendants to manufacture a defense after their liability had already been established.

The district court also noted that this tendered amendment would not alter the other bases for liability: (1) copyright infringement, (2) infringement of the FORD trademark, and (3) the state law unfair competition claims. Further, the claim concerning the mark obtained from Armstrong can be resolved in proceedings before the United States Patent and Trademark Office.

We are well satisfied that it was not an abuse of discretion to deny leave to amend.

In conclusion, we repeat that the district court did not abuse its discretion in either admitting and relying on exhibit 30 or re-

11. We note also that exhibit 30 is not merely a summary of the PLPAs. The numbers in the financial statements are used to arrive at the figures given in the exhibit. *See* n.8, *supra*, and text accompanying. The method used by Marrs was fully explained at trial. It was demonstrated that the relevant information in exhibit 30 was either contained in or computed from the PLPAs. *See* n. 5, *supra*. This is sufficient to be considered under rule 1006. *See* 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 1006[03] at 1006-6 (1978).

12. The appellants also claim that exhibit 30 and its back up material was not made available to them until after the beginning of the trial and that they did not have sufficient time to examine it. On the night before Marrs was to testify counsel for the appellants was allowed to review the exhibit and supporting documents. They were also all available in the courtroom. Further, at oral argument counsel for Ford Motor maintained that he had offered to allow the opposing side to review the exhibit months before the trial but that counsel for the appellants had decided to wait.

fusing to allow the defendants to amend their answer following the partial summary judgment.

Affirmed.