**CONOCO INC. (formerly Continental Oil Co.), Plaintiff–Appellant,**

v.

**DEPARTMENT OF ENERGY, Defendant–Appellee.**

No. 95–1281.

United States Court of Appeals, Federal Circuit.

Oct. 28, 1996.

As Corrected Jan. 2, 1997.

Keith A. Jones, Beck, Redden & Secrest, Washington, D.C., argued, for plaintiff-appellant. With him on the brief were Dennis M. Fenney and Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, KS. Also on the brief was Robert F. Ochs, Conoco, Inc., Houston, TX.

Jeffrey A. Clair, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., argued, for defendant-appellee. Counsel on the brief were Frank W. Hunger, Assistant Attorney General, and Bruce G. Forrest, Attorney. Of counsel were Paul T. Michael, and Don W. Crockett, Office of General Counsel, U.S. Department of Energy, Washington, D.C.

Before NEWMAN, SCHALL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Conoco Inc. appeals from a decision of the district court granting summary judgment to the Department of Energy (DOE) on its claim for restitution of crude oil pricing overcharges. The district court ordered Conoco to deposit into an escrow account overcharges that were made on sales of crude oil from several oil-producing properties operated by Conoco. *In re Dep't of Energy Stripper Well Exemption Litig.*, 874 F.Supp. 1161 (D.Kan.1994). We vacate the order of summary judgment and remand to the district court for further proceedings.

I

During the 1970s, the Federal Energy Administration, the predecessor to the Department of Energy, administered a system of price controls on the sale of crude oil. An important feature of the system was the "stripper well exemption," under which the sale of so-called "stripper oil" was exempt from the price controls. Stripper oil was defined as crude oil produced from property with an average maximum daily production of less than 10 barrels per well. The FEA's Ruling 1974–29, which interpreted the stripper well exemption, prohibited oil companies from counting "injection wells" (wells that are used to inject substances into underground reservoirs to force crude oil out of the ground) in computing the daily per-well production in a particular field; the FEA ruling permitted oil companies to count only "recovery wells" (wells that actually extract crude oil from the underground reservoirs). The effect of Ruling 1974–29 was to increase the amount of crude oil produced per well on properties with injection wells and thus to reduce the number of properties that qualified for the "stripper well" exemption from the price controls.

A number of oil companies challenged Ruling 1974–29. The companies obtained preliminary injunctions barring the government from enforcing the Ruling, subject to the condition that any producer who took advantage of the injunction had to deposit into an escrow account the difference between the stripper well price and the controlled price for the crude oil affected by the injunction.

When the Temporary Emergency Court of Appeals reversed the district court and upheld the Ruling, DOE counterclaimed against certain of the oil producers, including Conoco. DOE alleged that its audits of oil-producing properties showed that the producers had not deposited sufficient funds into the escrow account to cover the amount of the overcharges on crude oil sold while the "stripper well" injunctions were in effect.

DOE's claims against Conoco related to several properties in which Conoco served as the "operator." That is, Conoco conducted the oilfield operations for various "working interest owners," investors who were entitled to a share of the proceeds of the field. Some of the interest owners had executed "division orders," which permitted Conoco to sell their share of the production for them. Other interest owners took their share of the production in kind and sold it on their own. DOE's claims in this case relate only to the in-kind production for each of the properties. The question presented to the district court was whether there were overcharges during the injunction period with respect to those in-kind sales and, if so, whether Conoco was liable to DOE for those overcharges.

The district court granted summary judgment in favor of DOE with respect to six of the subject properties, which are the only ones as to which there is any continuing dispute between the parties. The court held that DOE's evidence established that Conoco's working interest owners had made overcharges on sales of oil from those properties, and it held that Conoco was liable for the full amount of those overcharges under the so-called "operator liability doctrine." *See In re Dep't of Energy Stripper Well Exemption Litig. (W.R. Murfin v. U.S. Dep't of Energy)*, 90 F.3d 1551 (Fed.Cir.1996); *United States v. Exxon Corp.*, 773 F.2d 1240, 1269–72 (Temp.Emer.Ct.App.1985); *Sauder v. Department of Energy*, 648 F.2d 1341, 1347–49 (Temp.Emer.Ct.App.1981). In its judgment, the court ordered Conoco to contribute $9,275,125 plus interest into the escrow account.

II

Conoco's first argument is that for five of the six properties at issue on this appeal the

only evidence in the record showing that overcharges occurred is inadmissible hearsay. With respect to two of the properties (North West Hewitt and O'Brien Strawn), the district court ruled that the evidence offered by DOE was admissible under the business records exception to the hearsay rule, Fed.R.Evid. 803(6). With respect to three other properties (Plum Bush Creek, North West Adell, and North West Velma Hoxbar), the district court ruled that the evidence offered by DOE was admissible under the residual exception to the hearsay rule, Fed.R.Evid. 803(24). We uphold the district court's ruling with respect to the evidence admitted under the business records exception, but we reverse the district court's ruling with respect to the evidence admitted under the residual exception.

### A

To prove the overcharges attributable to the North West Hewitt field, the government submitted "run statements" that were provided to DOE by the successor to Cities Service Company (Cities). During the pertinent period, Cities purchased the crude oil produced from the North West Hewitt field from the 26 working interest owners who took their share of the production in kind. The run statements were offered to show that Cities paid stripper oil prices for the crude oil it purchased from that field.

To prove the overcharges attributable to the O'Brien Strawn field, the government submitted purchase invoices that had been provided to DOE by Conoco. Conoco had obtained the purchase statements from Koch Oil Company. During the pertinent period, Koch purchased the crude oil from that property from Getty Oil Company, the working interest owner that took its share of the production in kind. The purchase invoices were offered to show that Koch paid stripper oil prices for the crude oil it purchased from the O'Brien Strawn field.

The district court held that the run statements from Cities and the purchase statements from Koch were admissible as business records, and we agree. Rule 803(6) authorizes the admission, over a hearsay objection, of a record

made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [record], all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Because of the general trustworthiness of regularly kept records and the need for such evidence in many cases, the business records exception has been construed generously in favor of admissibility. *See, e.g., United States v. Ray,* 930 F.2d 1368, 1370–71 (9th Cir.1990); *In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238, 289 (3d Cir.1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Hines,* 564 F.2d 925, 928 (10th Cir.1977). District courts, moreover, are accorded broad discretion in determining whether a proper foundation has been laid for admitting business records. *See Munoz v. Strahm Farms, Inc.,* 69 F.3d 501, 503–04, 36 USPQ2d 1499, 1501–02 (Fed.Cir.1995); *Pacific Serv. Stations Co. v. Mobil Oil Corp.,* 689 F.2d 1055, 1061 (Temp.Emer.Ct. App.1982).

Conoco argues that DOE failed to proffer testimony from a "custodian or other qualified witness" in support of the admission of the Cities "run statements" and the Koch "purchase statements." Courts have made clear, however, that the "custodian or other qualified witness" who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the record-keeping entity, as long as the witness understands the system used to prepare the records. *See, e.g., United States v. Ray,* 930 F.2d at 1370–71 (foundation testimony provided by welfare fraud investigator "familiar with the filing and reporting requirements for public assistance benefits and the forms used in connection with those requirements"); *United States v. Franco,* 874 F.2d 1136, 1138 (7th Cir.1989) (drug enforcement agent provided foundation

testimony for records of money exchange enterprise); *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986) (FBI agent was "qualified witness" to provide foundation for admission of business records seized from investment firm); *United States v. Veytia–Bravo,* 603 F.2d 1187, 1191–92 (5th Cir.1979) (federal agents provided foundation for admission of records of a munitions dealer). Moreover, the sufficiency of the foundation evidence must be assessed in light of the nature of the documents at issue; documents that are standard records of the type regularly maintained by firms in a particular industry may require less by way of foundation testimony than less conventional documents proffered for admission as business records. *See United States v. Johnson,* 971 F.2d 562, 571 (10th Cir.1992).

In support of the admission of the Cities "run statements" and the Koch "purchase statements," DOE offered the declarations of John Wesner, a DOE auditor with more than 18 years of experience auditing oil companies. From March 1978 through August 1982, Wesner developed DOE's system for auditing most of the refiners involved in the multidistrict stripper well litigation. Thus, the court could reasonably conclude that Wesner was familiar with the type of documents oil companies routinely maintain and the procedures used to prepare those documents.

Based upon his experience as a DOE auditor and his examination of the Cities "run statements," Wesner concluded that Cities had compiled the statements "in the normal course of its activities at the time it purchased the crude oil in question." With respect to the Koch "purchase statements," Wesner likewise concluded that the statements were records of the crude oil the company purchased and that they were compiled "in the normal course of [Koch's] activities at the time it purchased the crude oil in question." In light of Wesner's qualifications and the nature of the documents he was addressing, we hold that the district court did not abuse its discretion in ruling that Wesner was a "qualified witness" within the meaning of Rule 803(6) and that the challenged evidence was admissible as business records.

## B

■ To prove overcharges on the remaining three contested properties (Plum Bush Creek, North West Adell, and North West Velma Hoxbar), DOE proffered "purchase schedules," which consisted of summaries prepared, long after the events, by the purchasers of crude oil from those units (Unocal Corporation, ARCO Oil and Gas Company, and Mobil Oil Corporation) in response to Conoco's request for information for DOE's audit. The district court held the purchase summaries admissible under the general residual hearsay exception, Fed.R.Evid. 803(24). In doing so, the court erred.

The two residual hearsay exceptions in the Federal Rules of Evidence, Fed.R.Evid. 803(24) and 804(b)(5), were meant to be reserved for exceptional cases. They were not intended to confer "a broad license" on trial judges "to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b)." S.Rep. No. 94–199, at 20 (1975). *See Fong v. American Airlines, Inc.,* 626 F.2d 759, 763 (9th Cir.1980); *United States v. Kim,* 595 F.2d 755, 765 (D.C.Cir.1979); *United States v. Bailey,* 581 F.2d 341, 347 (3d Cir.1978).

■ Rule 803(24) provides that evidence proffered for admission under that rule must possess "circumstantial guarantees of trustworthiness" equivalent to those possessed by evidence admissible under the other hearsay exceptions set forth in Rule 803. In addition, the court must determine that the proffered evidence is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and that "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Fed.R.Evid. 803(24)(B), (C). Although a district court is accorded substantial discretion in determining whether to admit evidence under Rule 803(24), we conclude that the district court abused its discretion in admitting the purchase summary evidence in this case.

DOE argues that the purchase summaries are as trustworthy as market reports or commercial publications that are admissible under Rule 803(17). That rule, however, requires that such commercial publications be "generally used and relied upon by the public or by persons in particular occupations." Unlike market reports, telephone directories, weather reports, mortality tables, or like documents that come within the ambit of Rule 803(17), the purchase summaries at issue in this case were not prepared with the view that they would be in general use by an industry or members of the public having a general need to rely on information of that type. And unlike the publishers of the types of commercial documents that are typically admissible under Rule 803(17), the purchasers who prepared the summaries did not, by transmitting them to Conoco, stake their business or public reputations on the accuracy of the summaries. The summaries therefore do not have the same indicia of reliability as commercial publications that are admissible under Rule 803(17).

The district court regarded it as significant that "Conoco itself relies on [summary-type documents] when favorable to Conoco," and that, based on similar documents, Conoco persuaded DOE that no . overcharges occurred with respect to particular volumes of production. "Having requested the information, and having chosen to rely upon the favorable responses," the court reasoned, "Conoco should in all fairness be bound by the unfavorable responses."

Conoco's reliance, for some purposes, on purchase summaries provided by crude oil purchasers does not constitute a waiver of its right to object to the admission of those materials in court. Parties often rely in negotiations on materials that would not be admissible as evidence. Moreover, it is not unusual or improper for a party to offer evidence in court to which an objection could be raised; if the opposing party chooses not to object, the evidence can properly be admitted. The fact that a party has proffered evidence of a particular type does not in any event constitute a representation that evidence of that type is not subject to objection. Thus, there is no inconsistency or unfairness

in Conoco's relying on the purchase summaries in negotiating with DOE, in dealing with third parties, or in seeking relief from the court, but insisting that such materials, when offered against it, be supported by foundation testimony sufficient to satisfy the Federal Rules of Evidence.

DOE points out that the purchasers who prepared the summaries have no stake in the outcome of this case and therefore had no motivation to falsify the information they provided. For that reason, DOE argues the summaries are as trustworthy as the business documents that presumably underlie them. But lack of motivation to dissemble is not alone sufficient to support the admission of evidence over a hearsay objection. Business records are regarded as trustworthy because they are prepared contemporaneously with the recorded events and because businesses need to rely on them in their commercial affairs. The summaries at issue in this case have none of those characteristics: they were apparently prepared long after the events they purport to record, and they were designed to be passed on to others, not to be relied on by the preparing company itself. *See United States v. Kim,* 595 F.2d at 760–66 (bank report prepared long after the events in question and in response to government subpoena held inadmissible under Rule 803(24)).

Significantly, the Federal Rules of Evidence are not silent with respect to the admission of summaries of other records. The rules permit the introduction of summaries of records, but only if the records from which the summaries were prepared are admissible and are made available to the opposing party for examination or copying. Fed.R.Evid. 1006; *United States v. Pelullo,* 964 F.2d 193, 204–05 (3d Cir.1992); *Ford Motor Co. v. Auto Supply Co.,* 661 F.2d 1171, 1175 (8th Cir.1981); *United States v. Kim,* 595 F.2d at 764. Thus, the rules recognize that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents. It follows *a fortiori* that when no foundation for the underlying documents has been laid and when those

documents have not been made available to the opponent of the evidence (because the proponent does not even have the underlying materials), summaries prepared from those documents would be objectionable under Rule 1006.

In addition to lacking the indicia of trustworthiness required by Rule 803(24), the purchase summaries were not shown to be more probative than other evidence reasonably available to DOE. The summaries were prepared by three oil companies. We see no reason that DOE should not be able to obtain from those three companies the underlying documents from which the summaries were prepared and evidence explaining how the underlying documents were prepared. Since DOE "made no showing that reasonable efforts could not have produced" more probative evidence, the evidence was not admissible under Rule 803(24). *United States v. Scrima*, 819 F.2d 996, 1001 (11th Cir.1987); *see also United States v. Sutton*, 795 F.2d 1040, 1057 (Temp.Emer.Ct.App.1986); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 586 (3d Cir.1984); *United States v. Heyward*, 729 F.2d 297, 300 (4th Cir.1984).

Our decision in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1560–62, 30 USPQ2d 1001, 1002–04 (Fed.Cir.1994), is not to the contrary. In that case, the plaintiff sought to prove personal jurisdiction by offering out-of-court statements by employees of six retail chain outlets that a particular item was available for sale at each of the outlets. This court held that the evidence could be used for that purpose. The court first noted that the defendants had cited no authority for the proposition that hearsay evidence cannot be considered when deciding whether to grant a motion to dismiss under Fed. R. Civ. Proc. 12(b)(2). The court then reasoned that because the defendants did not dispute that the six stores had the item on sale, even though they easily could have done so, the defendants "can thus be said to have acquiesced in the trustworthiness of the evidence." Finally, the court suggested that the evidence might "very well be admissible at trial [under Rule 803(24)] notwithstanding its hearsay nature," and that

it therefore could be considered for purposes of Rule 12(b)(2). 21 F.3d at 1562.

In this case, the summary evidence is not being relied upon for the threshold inquiry into jurisdiction, but to prove the ultimate fact of liability and the amount of damages. Moreover, a statement by a retail store employee that a particular item is available in the store can be viewed as carrying significant assurances of trustworthiness, as it is akin to a statement of present sense impression, Fed.R.Evid. 803(1), or a market quotation on which the public is expected to rely, Fed.R.Evid. 803(17). In any event, it was not necessary for the court in *Beverly Hills Fan* to resolve conclusively the question of admissibility, and the court did not do so. The *Beverly Hills Fan* case thus does not support the government's contention that the summaries at issue in this case are admissible under Rule 803(24).

## C

■ While we agree with Conoco that the district court erred in holding the summaries admissible on the record before it, and that the summary judgment in favor of DOE on the three affected properties must be vacated for that reason, we do not agree with Conoco that it is entitled to summary judgment in its favor with respect to the overcharges that DOE sought to prove through those summaries. Our jurisdiction on this appeal is to review the order granting DOE's motion for summary judgment. While we would have the authority, in this case within our jurisdiction, to direct the entry of judgment in Conoco's favor if we determined that the circumstances called for such a disposition, *see* 28 U.S.C. § 2106, we decline to do so. If this case had gone to trial and the court had based its ruling on the summary evidence, we would simply remand for a new trial, at which DOE would have an opportunity to present admissible evidence; we would not reverse and direct the entry of final judgment for Conoco. The same disposition is appropriate here. The fact that DOE sought to use an evidentiary shortcut to obtain summary judgment in this case does not justify our directing the entry of final judgment in Conoco's favor without giving DOE an oppor-

tunity to offer evidence to replace the evidence that the district court found sufficient but that we have held inadmissible. *See* 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.13, at 56–179 (1996 ed.) (directing .summary judgment for the appellant is appropriate only if appellate court is "quite certain that no further exploration of the facts is in order").

### III

The district court held Conoco liable for the overcharges made by the in-kind interest owners based on the "operator liability" doctrine. The court found that Conoco was the "animating force behind the overcharges and caused the overcharges to occur," and that requiring DOE to pursue individual interest owners "would place an enormous burden on DOE." The court therefore held that Conoco could be held liable for the overcharges even though Conoco was not the recipient of the excess proceeds.

Conoco has not challenged the application of the operator liability doctrine in this case. The argument that Conoco makes with respect to liability is a narrower one: it argues that it is not liable for overcharges attributable to sales by two of the in-kind working interest owners, Phillips Petroleum Company (Phillips) and Getty Oil Company (Getty), because those two companies previously entered consent orders with DOE in which DOE surrendered its right to pursue any overcharge claims against them.

The district court rejected Conoco's argument. Relying on the decision of the Temporary Emergency Court of Appeals in *United States v. Exxon Corp.*, *supra*, the court concluded that Conoco could be held liable, as an operator, for overcharges by Phillips and Getty, as working interest owners, regardless of whether Phillips and Getty had obtained a release from liability for the same overcharges by settling with DOE.

The *Exxon* case involved an oil-producing field that Exxon operated on behalf of a number of working interest owners. Based on what the court characterized as Exxon's role as "the 'animating force' responsible for violating the crude oil pricing regulations,"

773 F.2d at 1277, the court held Exxon liable for overcharges made by the working interest owners in that field. As part of· its defense, Exxon pointed to global settlements previously reached between DOE and several of the working interest owners. Exxon argued that it should not be liable for overcharges made by those owners because the global settlements should be treated as releasing any claim by DOE to any potential recovery for those overcharges, including recovery against Exxon under the operator liability doctrine.

In rejecting Exxon's argument, the court pointed to the language of the consent orders before it. Those agreements contained language "to the effect that [DOE] released 'completely all administrative and judicial claims, demands, liabilities, causes of action or other proceedings that (DOE) has asserted or may be able to assert ... out of any federal petroleum price or allocation requirement' for the period covered by the consent Order." 773 F.2d at 1275. The rights conferred by those agreements, the court concluded, did not purport to release Exxon from any liability that it might have to any other party, including the government. As the court explained, "[a]ny rights under the consent orders accrued solely to the settling parties and not to Exxon." 773 F.2d at 1276.

Conoco first seeks to distinguish *Exxon* by reference to the language in the different consent orders at issue in this case, but we find that proposed distinction unpersuasive. The language of the consent orders in this case differs somewhat from the language quoted from the consent orders at issue in *Exxon*, but not in a material way. The *Exxon* court found that the consent orders between DOE and the working interest owners were of no avail to the operator, Exxon, because the consent orders did not purport to confer any rights on Exxon, which was not a party to the agreements. The same is true here. Moreover, while Conoco points to language in the Phillips and Getty consent orders that is somewhat broader than the language quoted by the court in *Exxon*, the. government responds that virtually the same language appeared in portions of the consent orders that were at issue in *Exxon* but not

quoted by the court. Conoco does not dispute the government's characterization of those orders.

■ Conoco's second ground for distinguishing *Exxon* raises an argument that was not specifically addressed in *Exxon*. Conoco argues that to deny an operator any benefit from consent orders between DOE and the operator's working interest owners would result in a double recovery for DOE, a result that is contrary to the equitable principles of restitution. Both parties agree that equity forbids DOE from obtaining a double recovery; they disagree only about whether a double recovery has in fact occurred in this case with respect to the portion of the judgment against Conoco that is attributable to overcharges by Phillips and Getty in their capacity as working interest owners (or representatives of other parties) on Conoco-operated properties.

The consent orders that DOE entered with Phillips and Getty were global settlements. No particular portion of the payments that Phillips and Getty agreed to make were designated as attributable to the three properties at issue in this case for which Phillips and Getty were working interest owners. While it is true that DOE surrendered all its potential claims against Phillips and Getty with respect to those properties, that does not necessarily mean that the consent orders provided full restitution, or indeed any restitution at all, for the overcharges made on oil sales attributable to those properties. Thus, contrary to the assumption underlying the dissent, it is entirely possible for DOE to have released either Phillips or Getty from any prospective liability for overcharges as working interest owners without having exacted restitution for those overcharges.

DOE argues that its audit program was directed entirely at operators, and that its consent orders with the oil companies therefore focused on each company's liability as an operator, even though the consent orders prohibited the government from seeking further recovery against each company in its capacity as a working interest owner. Because the consent orders were negotiated against the background of an audit program that was directed exclusively at operator liability, DOE contends that the agreements did not effect restitution for any overcharges by the oil companies as working interest owners, and that the district court was therefore correct not to treat the action against Conoco as a device to obtain a second recovery of restitution already obtained through the consent orders.

DOE's analysis is clearly correct as applied to a different consent order that was before the district court but is not at issue on this appeal—the consent order between DOE and Texaco. In that agreement, the parties specifically provided that the amount paid under the settlement was not attributable to Texaco's activities as a working interest or royalty interest owner on properties for which it was not the operator. Therefore, as the district court held, that consent order left DOE free to seek additional restitution from the operators of such properties without obtaining a double recovery.

Unfortunately, the Phillips and Getty consent orders contain no such language and thus do not make clear whether the payments made pursuant to those agreements include restitution for overcharges on properties on which Phillips and Getty held working interests. The problem, then, is to determine whether to treat the payments made by Phillips and Getty under their consent orders as constituting restitution attributable in part to their interests in the three properties at issue here (North West Velma Hoxbar, North East Cherokee, and O'Brien Strawn), or to treat those consent orders as providing restitution only for properties as to which Phillips and Getty were operators. If the former view of the consent orders is correct, as Conoco argues, then restitution has already been made on the Phillips and Getty working interest properties, and obtaining further restitution from Conoco for those properties would result in a double recovery. If the latter view of the consent orders is correct, as DOE urges, then no part of the payments made under the consent orders would be attributable to overcharges by Phillips and Getty on the three properties at issue here, and imposing full liability on Conoco for those overcharges would not result in a double recovery.

In addressing the double recovery issue, the district court did not resolve that issue. Rather, the district court concluded that there was no double recovery because Conoco has been given credit for all refunds previously made by Conoco's working interest owners. That is not a complete answer to Conoco's argument, however, because it does not address Conoco's contention that Phillips and Getty made restitution for their overcharges as working interest owners through their consent orders with DOE.

The double recovery issue is not one that we can resolve on the present record. The issue can be resolved only by answering the question whether the Phillips and Getty consent orders were intended to effect restitution only for properties operated by Phillips and Getty, or whether the payments by Phillips and Getty were also intended to effect restitution for their overcharges as working interest owners. DOE should bear the burden of proof on that issue for several reasons: (1) DOE is the party seeking recovery; (2) DOE presumably has superior access to information regarding its negotiations with Phillips and Getty; and (3) DOE could have avoided this issue altogether simply by drafting the consent orders with Phillips and Getty more carefully to make clear that they reflected restitution only on properties operated by Phillips and Getty, as was done in the case of the Texaco settlement. *See generally Pratt v. Watkins,* 946 F.2d 907, 911–12 (Temp.Emer.Ct.App.1991). While proof as to the scope of the restitution that was intended to be paid through the Phillips and Getty agreements may be difficult to muster so many years after the fact, resolving that issue is the only way to settle the question whether imposing liability on Conoco for unrefunded overcharges by Phillips and Getty as working interest owners on Conoco-operated property would result in a double recovery for DOE.

## IV

The final issue that Conoco raises concerns the proper calculation of prejudgment interest. The district court held that interest on each overcharge began to accrue at the end of the month during which the overpriced crude oil was delivered, regardless of when payment of the overcharge was actually made. We agree with Conoco that because interest is intended to compensate the beneficiary of a restitution order for the loss of the use of money over time, *see MAPCO Int'l, Inc. v. Federal Energy Regulatory Comm'n,* 993 F.2d 235, 247 (Temp.Emer.Ct.App.1993), principles of restitution dictate that interest does not accrue until the date the overcharge was actually paid and received. *See* ALI, *Restatement of Restitution* § 156 (1937); *In re Dep't of Energy Stripper Well Litig. (Chevron U.S.A., Inc. v. Dep't of Energy),* 944 F.2d 914, 916 (Temp.Emer.Ct.App.1991) ("injury ... is properly measured by what the injured party lost by not having the money available for its use").

If the working interest owners had never been paid at all, there would be no restitution to be made, and of course no interest to be paid. It follows logically that the restitutionary obligation does not accrue until the pertinent payments are received, and that the obligation to pay interest runs only from the date that the restitutionary obligation accrued. We therefore direct that on remand interest should be calculated from the date that the particular overcharge was received by the party that made the sale in question.

## V

In summary, we vacate the judgment in DOE's favor in three respects. With regard to the portion of the judgment attributable to the Plum Bush Creek, North West Adell, and North West Velma Hoxbar properties, we vacate the restitutionary order because it rests in part on evidence that we have held inadmissible. With regard to the portion of the judgment attributable to overcharges by Phillips Petroleum Company and Getty Oil Company on sales based on their working interests in the North West Velma Hoxbar, North East Cherokee, and O'Brien Strawn properties, we vacate the restitutionary order and direct that the district court determine whether obtaining restitution from Conoco for those overcharges would result in a double recovery by DOE. With regard to interest, we vacate the judgment and direct

that the interest payments at issue before the district court be calculated as directed above.

Each party shall bear its own costs for this appeal.

*VACATED AND REMANDED.*

PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.

Although I agree with the court's reasoning in Part II, I respectfully dissent from the decision to remand as set forth in Part III.

The district court incorrectly held Conoco liable for the working interest overcharges by Getty Oil and Phillips Petroleum. The court viewed the settlement contracts between the Department of Energy and each of Getty Oil and Phillips Petroleum as leaving open the question of whether there remained "working interests for which restitution has not yet been made," and then interpreted the agreements so as to impose liability on Conoco for the Getty and Phillips working interest overcharges in the fields operated by Conoco. This issue is ripe for appellate review, for the double recovery issue, that the majority remands for decision by the district court, was decided by the district court.

Conoco argues that the district court incorrectly interpreted the settlement agreements. I agree, for Getty and Phillips each resolved with the government, by settlement, all issues of liability under the petroleum price control regulations. They settled and ended all of the claims against them, whether the claims derived from activities as operator or as working interest owner. Thus no recovery of Getty and Phillips overcharges can now be obtained from Conoco.

The Phillips consent order states explicitly that it covers Phillips' activities as working interest owner:

> References in this Consent Order to Phillips include (without limitation) its officers, directors, employees, subsidiaries, affiliates, and successors in interest, and its petroleum-related activities as refiner, producer, operator, *working or royalty interest owner,* reseller, natural gas processor, or otherwise.

The Phillips consent order also states that "all pending and potential claims" by DOE regarding its compliance are "resolved and extinguished":

> All pending and potential claims, demands, liabilities, causes of action or other proceedings by DOE regarding Phillips' compliance with federal petroleum price and allocation requirements during the period covered by this Consent Order, whether or not heretofore raised ... are resolved and extinguished by this Consent Order.

The Getty consent order is similarly broad. With the exception of certain itemized issues not here relevant, the Getty settlement provides that:

> All claims and demands of every kind, nature and description pertaining to Getty's compliance with all aspects of the petroleum price regulations and mandatory petroleum allocation regulations during the period covered by this Consent Order, whether or not raised by [DOE] are resolved by this Consent Order.

These agreements do not draw a line that could reasonably exclude settlement of Getty and Phillips' overcharges for working interest oil. To the contrary, the agreements make explicit that their purpose is to resolve all obligations of Getty and Phillips for petroleum price overcharges. The government could not now, on remand, unilaterally establish that these agreements mean something other than what is clearly stated in their plain texts. *See Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) ("The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face.")

The panel majority appears to believe that the recovery by DOE in its settlements with Getty and Phillips does not mean that restitution was made. However, the action brought by DOE under § 209 of the Economic Stabilization Act was an action in resti-

tution. The large sums that Getty and Phillips paid is not a settlement distinct from restitution; it is restitution. The statute is explicit:

> § 209. Whenever it appears to any person authorized by the President to exercise authority under this title [that this title has been violated] upon a proper showing a temporary restraining order or a preliminary or permanent injunction shall be granted without bond.... *In addition to such injunctive relief, the court may also order restitution of moneys received* in violation of any such order or regulation.

Congress stressed, in enacting the Economic Stabilization Act ("ESA"), that the explicit reference to restitution in § 209 was to remove any doubt that "there was an inherent equitable power in the court to set things right and order restitution." S.Rep. No. 507, 92nd Cong., 1st Sess. 9, *reprinted in,* 1971 U.S.C.C.A.N. 2283, 2291. Although other provisions of the ESA permit recovery of fines, private actions, or multiplication of damages, *see Van Vranken v. Atlantic Richfield Co.,* 38 F.3d 1200, 1204–04 (Fed.Cir. 1994) (discussing differences between actions brought under § 209 and § 210 of the ESA), the actions that were settled against Getty and Phillips included all pending and potential claims under § 209, which relates to injunction and restitution.

Getty and Phillips settled their total liability under § 209 of the ESA for overcharges of working interest oil. This necessarily included oil for which Conoco was the operator. Getty and Phillips resolved all claims, "pending and potential," and paid DOE the sums agreed upon in restitution. Conoco can not now be charged with restoring, through DOE, that which Getty and Phillips have already restored through DOE. Thus I do not join my colleagues' decision to remand for determination of whether the Getty and Phillips settlements included their working interests or only their operating interests. DOE can not contradict *ex parte* the plain language of the settlements. Thus I would exercise review, and resolve the issue on appeal.