CHEVRON U.S.A. INC.,
Plaintiff–Appellant,

v.

MOBIL PRODUCING TEXAS & NEW MEXICO, Defendant–Appellee,

and

Mobil Oil Corporation, Defendant–Appellee.

No. 01–1016.

United States Court of Appeals,
Federal Circuit.

Feb. 27, 2002.

Susan R. Richardson, Cotton, Bledsoe, Tighe & Dawson, P.C., of Midland, TX, argued for plaintiff-appellant. With her on the brief were Chris Aycock, and David W. Lauritzen. Of counsel on the brief was Alan I. Horowitz, Miller & Chevalier, Chartered, of Washington, DC.

David J. Beck, Beck, Redden & Secrest, L.L.P., of Houston, TX, argued for defendants-appellees. With him on the brief was Michael E. Richardson. Of counsel on the brief were Mark D. Wegener and Edward Han, Howrey Simon Arnold & White, LLP, of Washington, DC.

Before MAYER, Chief Judge, PAULINE NEWMAN and CLEVENGER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Chevron U.S.A. Inc. brought suit against Mobil Producing Texas & New Mexico and Mobil Oil Corporation (collectively "Mobil") for restitution in connection with payments Chevron made to the Department of Energy ("DOE") for stripper well overcharges attributable to Mobil's working interest in a property operated by Chevron's predecessor in interest, the Gulf Oil Corporation. The United States District Court for the Western District of Texas, granting Mobil's motion for summary judgment,[1] ruled that a Consent Order entered into by Mobil and DOE in 1979 had settled Mobil's liability for all violations through May 1979, including the stripper well overcharges attributed to this working interest. We conclude that these stripper well overcharges were not settled in the Mobil/DOE Consent Order, and that Chevron is entitled to recover from Mobil

---

1. *Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico and Mobil Oil Corp.,* No. MO–99–CA–054 (W.D.Tex. Aug. 1, 2000).

the payments that Chevron made to DOE based on overcharges attributed to Mobil's working interest. We reverse the district court's ruling with respect to entitlement, and remand for further proceedings.

## BACKGROUND

The United States instituted price controls for crude oil pursuant to the Economic Stabilization Act of 1970 ("ESA"), Pub.L. No. 91–379, 84 Stat. 799 (*codified at* 12 U.S.C. § 1904 note), and the Emergency Petroleum Allocation Act of 1973 ("EPAA"), Pub.L. No. §§ 93–159, 87 Stat. 627 (*codified at* 15 U.S.C. §§ 751–760h). *See generally Texas American Oil Corp. v. United States Dep't of Energy*, 44 F.3d 1557 (Fed.Cir.1995) (*en banc*) (Federal Circuit adoption of the precedent of the Temporary Emergency Court of Appeals).

Section 4(e)(2)(A) of the EPAA contained a "stripper well exemption" that allowed crude oil to be sold at free market prices when it was produced at a property with an average maximum daily production of ten barrels per well during the preceding twelve-month period. *See generally Energy Reserves Group, Inc. v. Dep't of Energy*, 589 F.2d 1082, 1087–89 (Temp.Emer.Ct.App.1978) (detailed history of the stripper well exemption). Some operators, in their calculation of average production per well for a specified property, counted the injection wells along with the producing wells. Injection wells do not extract oil but are used to inject substances into the underground reservoirs serving the producing wells, in order to aid in the extraction of oil.

In December 1974 the Federal Energy Administration ("FEA"), the predecessor to DOE in administering these statutes, ruled that injection wells cannot be included in calculating the average daily production per well, issuing Ruling 1974–29. A group of producing companies, forming the Energy Reserves Group, challenged Ruling 1974–29 in the United States District Court for the District of Kansas. The Kansas district court held that Ruling 1974–29 was void and unenforceable because it was issued in violation of the rulemaking requirements of the Administrative Procedure Act. The court enjoined the FEA from enforcing Ruling 1974–29 against the companies that constituted the Energy Reserves Group. *Energy Reserves Group, Inc. v. Fed. Energy Admin.*, 447 F.Supp. 1135 (D.Kan.1978). The Kansas district court extended the injunction to the benefit of Mobil on September 6, 1978 and Gulf on June 25, 1979.[2] Pending decision of the appeal to the Temporary Emergency Court of Appeals, the district court required each of the oil companies to deposit into an escrow account the difference between the actual free market price and the regulated price, for oil whose stripper well character was based on inclusion of injection wells.

The Temporary Emergency Court of Appeals ultimately upheld the validity and enforceability of Ruling 1974–29, reversing the rulings of the Kansas district court. *In re Dep't of Energy Stripper Well Exemption Litig.*, 690 F.2d 1375 (Temp.Emer.Ct.App.1982). In 1986 the oil companies and DOE entered into a Final Settlement Agreement to resolve the distribution of the escrowed funds. However, DOE reserved the right to claim additional recovery if DOE determined, upon further audit, that insufficient funds had been deposited into escrow.

Meanwhile, in 1979, while DOE's appeal on the basic question of how to calculate

---

**2.** All of the cases concerning Ruling 1974–29 were consolidated by the Judicial Panel on Multidistrict Litigation as M.D.L. 378, and assigned to the Kansas district court. *In re Dep't of Energy Stripper Well Exemption Litig.*, 472 F.Supp. 1282 (J.P.M.L.1979).

stripper well status was pending, Mobil and DOE entered into a Consent Order for the period from September 1973 through May 1979. DOE had conducted an audit of Mobil's compliance with crude oil price regulations for the period from September 1973 through December 1976, and the findings of this audit were extrapolated forward through May 31, 1979. The Consent Order stated that it resolved "all crude oil sales from its properties for the period covered by this Consent Order," on payment of $13.7 million. Notice of the Consent Order was published in the Federal Register on September 20, 1979 (for comment) and November 23, 1979 (final Order).

In 1987 DOE sued Chevron for additional recovery under the ESA and the EPAA. Chevron states that a portion of the claim by DOE included the liability of Chevron's predecessor Gulf as operator for overcharges from September 1977 through October 1978 attributed to Mobil's working interest in a property operated by Gulf at the East Waddell Ranch in Texas. *In re Dep't of Energy Stripper Well Exemption Litig.*, 746 F.Supp. 1452 (D.Kan.1990), *aff'd in part*, 944 F.2d 914 (Temp.Emer.Ct.App.1991). The suit invoked the doctrine of operator liability, which permits the DOE, as a matter of administrative convenience, to recover from the operator the full amount of all overcharges for oil from the operated property, even when only the working interest owners, not the operator, received the overpayment. *See W.R. Murfin Drilling Co. v. United States Dep't of Energy*, 90 F.3d 1551, 1555 (Fed.Cir.1996) (explaining the operator liability doctrine). During the period September 1977 through October 1978, stripper well oil from Mobil's working interest in the East Waddell Ranch was sold by Mobil to Gulf at free market prices, contrary to Ruling 1974–29. Neither Mobil nor Gulf had made deposits

into escrow to cover these charges through October 1978; Gulf began making deposits that included Mobil's working interest in November 1978.

In 1992 Chevron settled all of DOE's claims by payment of a total of $99,539,230. Chevron states that $1,647,080 ($396,000 in actual overcharges plus interest) of this payment was due to the improper characterization of stripper well sales from Mobil's working interest in the East Waddell Ranch from September 1977 through October 1978. Chevron seeks reimbursement from Mobil on a theory of "operator restitution," described by Chevron as an equitable remedy responding to the operator liability doctrine.

The district court held that Chevron was not entitled to this recovery because Mobil, by its Consent Order with DOE in 1979, resolved all of its compliance matters related to crude oil sold between September 1, 1973 and May 31, 1979. The court ruled that this extinguished any stripper well violations attributable to Mobil's working interest in the East Waddell Ranch, and that Chevron is not entitled to recovery from Mobil for any payment that Chevron may have made to DOE based on Mobil's overcharges attributed to its working interest in misdesignated stripper wells. This appeal followed.

## DISCUSSION

■ The issues before the district court were decided on cross motions for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In evaluating a motion for summary judgment, the evidence of the non-movant is to be believed

and all justifiable inferences are drawn in favor of the non-movant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. This standard is not changed when the parties bring cross-motions for summary judgment, each nonmovant receiving the benefit of favorable inferences. *Murphy Exploration & Production Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir.1996). The grant of summary judgment is subject to plenary review. *Murfin,* 90 F.3d at 1555.

▪ Depending on the circumstances, an operator who has accounted to DOE under the operator liability doctrine may or may not be entitled to contribution from the working interest owners. "[T]he right of contribution depends on the particular facts, and is imposed when justice requires." *Murphy,* 101 F.3d at 674.

The district court held that Chevron would not be entitled to contribution for Chevron's payments to DOE attributable to overcharges from Mobil's working interest if Mobil had (1) previously settled its liability for these overcharges in the 1979 Consent Order, and (2) had provided Chevron with notice of this settlement. Chevron does not challenge this theory as applied to the audited and extrapolated overcharges settled by Mobil in 1979. However, Chevron argues that the Mobil/DOE 1979 Consent Order did not and could not include settlement of Mobil's stripper well liability, for DOE was enjoined from enforcing Ruling 1974–29, the Consent Order was not brought to the Kansas district court, and in 1979 there was no stripper well liability. Mobil responds that Chevron should have raised Mobil's Consent Order with DOE as a defense to the inclusion of Mobil's working interest overcharges in the assessment against Chevron, that such a defense

would have been successful or at least would have clarified the issue, and that Chevron has waived the right now to seek contribution from Mobil.

The Texas district court found that DOE and Mobil could not have resolved Mobil's stripper well liability without the approval of the Kansas district court. However, the Texas district court also ruled that the Mobil Consent Order included Mobil's East Waddell Ranch stripper well working interest. The court observed that the Consent Order resolved "all" liability, and concluded that any ambiguity could be resolved by interpreting "all" as meaning everything that could be settled. Thus the court concluded that although Mobil and DOE could not settle Mobil's stripper well liability for which Mobil was the operator, without permission of the Kansas court, they could settle any working interest liability.

Chevron stresses the inconsistency of this ruling, and the absence of any support for this distinction. Chevron points to evidence that weighs against the conclusion that DOE and Mobil intended to settle Mobil's potential liability for stripper well overcharges for the East Waddell Ranch. Chevron states that Mobil's payments into escrow under Ruling 1974–29 through the effective date of the Consent Order totaled $19 million,[3] including deposits based on overcharges arising from working interests in various properties, although not including the East Waddell Ranch, and that after the Consent Order Mobil did not close or recover funds from this escrow account. Chevron points out that Mobil paid $13.7 million under the Consent Order for all violations since 1973 and that stripper/injection well liability was not in-

---

**3.** Chevron's initial brief uses the figure of $28.9 million, and its reply brief $19 million. The discrepancy is not well explained, but

does not appear to be material to our conclusion.

curred during the period of actual audit (1973–1976) upon which the projected liability to 1979 was based, and that the $19 million remained in escrow after the Consent. Chevron also points out that stripper well liability was not established until 1982 when the Temporary Emergency Court of Appeals, reversing the district court, upheld the validity of the DOE ruling. Thus Chevron argues that Mobil's Consent Order could not have been intended to, and did not, resolve stripper well overcharges.

## A

■ On Mobil's theory that its 1979 Consent Order included stripper well liability for Mobil's working interest in the East Waddell Ranch from September 1977 through October 1978, DOE recovered twice for the same overcharges-first from Mobil in 1979, and then from Chevron in 1992. Mobil argues that if Chevron had been alert it could have avoided liability simply by raising the defense of the Mobil/DOE Consent Order, as Conoco had in similar circumstances. *See Conoco Inc. v. Dep't Of Energy*, 99 F.3d 387, 396–97 (Fed. Cir.1996) (holding that the operator has no liability for overcharges if DOE has already recovered from the working interest owner for the same overcharges). Chevron responds that it did not assert the Mobil/DOE Consent Order because the Consent Order did not include stripper well liability. Mobil responds that the Consent Order states the premise that "Mobil incorrectly determined ... the stripper well exemption," and thus that it must be assumed that the Consent Order included stripper well liability.

The district court evaluated the Mobil/DOE Consent Order "within the four corners" of the document, citing *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) for the explanation that consent decrees are interpreted in accordance with their text, and not by reference to the intent of a party to the decree. The district court pointed to the "Facts and Allegations" portion of the Consent Order, which stated the allegation that Mobil had violated the stripper well exemption, and focused on the following provision of the Consent Order:

> Mobil's performance under this Consent Order will constitute compliance with 10 C.F.R. Part 212, Subpart D with respect to all crude oil sales from its properties for the period covered by this Consent Order.

The district court ruled that " 'all' means all." However, the court also recognized that the Kansas district court's injunction precluded settlement of stripper well liability without the court's permission. Thus the Texas district court "harmonized" the Kansas court's injunction and the Consent Order:

> It is true that the Consent Order neither references the Kansas litigation nor excludes it from the matters settled. In a situation as unusual as this, however, the Court believes that its task is not to invalidate, but to harmonize, if reasonably possible. . . .

The court concluded that "the Consent Order settled all liability of Mobil except as to the properties covered in Mobil's litigation in Kansas." However, the Kansas litigation related to liability for working interests as well as operating interests.[4] While the injunction can be read in

---

4. Our colleague in dissent states that Mobil and DOE were not affected by the Kansas litigation because "Mobil did not pay any

sums into the Kansas escrow on behalf of the East Waddell Ranch property (because Gulf made those payments on Mobil's behalf)."

terms of operating interests, we deem it unlikely that the parties intended to settle Mobil's entire stripper well liability as working interest owner, *sub silentio;* especially when the escrow deposits contained working interest obligations. We take note that the settlement of $13.7 million paid by Mobil under the Consent Order was based on an audit of Mobil's records from 1973–76 for all violations. Mobil does not dispute Chevron's argument that Mobil's $19 million in escrow for stripper wells under Ruling 1974–29 was not affected by the Consent Order. Thus, although we agree with the district court that harmonization is desirable, we conclude that this working interest violation was not severable from other overcharges resulting from the stripper/injection well issue, and that the 1979 DOE/Mobil Consent Order did not settle stripper well charges that had not been ruled illegal. Indeed, liability did not arise until 1982 when the Temporary Emergency Court of Appeals reversed the ruling of the Kansas court. We conclude that the Consent Order did not settle Mobil's potential stripper/injection well liability for its working interest in the East Waddell Ranch.

## B

The question remains of whether Chevron as operator is entitled to contribution from Mobil as working interest owner, on the facts of this case. *See Murphy,* 101 F.3d at 674 (operator recovery is resolved as justice warrants). Mobil argues that Chevron waited too long to as-

sert this claim, that Chevron should have raised with DOE the issue of possible double payment and obtained clarification of the scope of the Mobil Consent Order. Mobil states, and its counsel averred, that it believed it had settled all liability that could arise from any source for the 1973–79 period. Mobil argues that Chevron's failure to assert the Mobil/DOE Consent Order as a defense against the DOE assessment relieves Mobil of any obligation to Chevron, even if there were no merit to the defense. Thus Mobil argues that even if Chevron is deemed correct in its position that the Consent Order did not include Mobil's working interest stripper well liability in the East Waddell Ranch, Chevron cannot prevail in its claim for equitable restitution. We agree that Chevron was not required to assert a useless or incorrect defense.

Mobil also argues that Chevron cannot prevail unless Chevron can prove that even if it had raised the Consent Order in its litigation with DOE, the result would have been the same. Mobil asserts that Chevron bears the same burden of proof as was placed on DOE in *Conoco,* 99 F.3d at 397, because Chevron is presenting the same basic argument here as did DOE in *Conoco.* Mobil contends that Chevron cannot meet this burden because it cannot prove that none of Mobil's $13.7 million payment under the Consent Order was attributable to Mobil's stripper/injection well liability for the East Waddell Ranch working inter-

That is inaccurate. The record is undisputed that Gulf did not make payments into the Kansas escrow for Mobil's working interest in the East Waddell Ranch for the relevant period (September 1977 through October 1978). These are the payments that Gulf/Chevron finally paid to DOE in 1992, and for which contribution is here sought. The dissent also states that "escrow payments in the Kansas suit were made only by operators, except in

instances where operators refused to do so, in which case the working interest holders paid the escrow sums." The record and the briefs do not so state. Indeed, Mobil in its brief states that it "deposited funds into escrow for non-operated properties only when another operator certified the property as stripper without the protection of an injunction" (Mobil Brief at 15 n. 6).

est. In *Conoco* the burden of proof was placed on DOE for three reasons:

> (1) DOE is the party seeking recovery; (2) DOE presumably has superior access to information regarding its negotiations with [working interest owners]; and (3) DOE could have avoided this issue altogether simply by drafting the consent orders ... more carefully.

99 F.3d at 397. However, in the case now before us reasons (2) and (3) fail as applied to Chevron, for (2) Chevron is not presumed to have superior access to information about the negotiation between Mobil and DOE, to which Chevron was not a party; and (3) Chevron did not draft DOE's agreement with Mobil. In view of Chevron's undisputed evidence that it paid DOE for Mobil's East Waddell Ranch stripper well overcharges, the burden devolved on Mobil of coming forward with evidence sufficient to show, at least *prima facie*, that it had already paid DOE for these overcharges. Mobil's only evidence was the existence of the Consent Order, which however was well outweighed by the circumstances of the Kansas court ruling, the absence of illegality, and the treatment of Mobil's stripper well escrow account.

■ Balancing the equities, it appears that Chevron paid DOE for the overcharges attributed to Mobil's working interest, while Mobil retained the benefits thereof. Equity does not serve one who profits at the expense of another. *See, e.g., Texas Co. v. Miller* (*In re Sitton & Herbert*), 165 F.2d 111, 114–15 (5th Cir. 1947) ("Equity does not look with favor on the unjust enrichment of one person at the expense of another.") DOE's recovery from Chevron as operator was solely as a matter of administrative convenience, not liability. *See Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932) ("considerations of mere convenience must yield to the essential demands

of justice"). Liability remained with Mobil, although paid by Chevron. Since Chevron was not at fault, it is entitled to recovery of the sum it paid to DOE for the overcharges attributed to Mobil's working interest. We reverse the judgment of the district court, and remand for implementation.

*REVERSED AND REMANDED.*

CLEVENGER, Circuit Judge, dissenting.

I respectfully dissent. This case asks which party, Chevron or Mobil, is liable for overcharges paid to the Department of Energy ("DOE") by Chevron, stemming from crude oil sales from production at the East Waddell Ranch in Texas. Though Mobil had a working interest in that property, it did not operate the property. Gulf, Chevron's predecessor, operated the East Waddell Ranch property. DOE sued Chevron, and Chevron settled, paying DOE $1,647,080 due to overcharges related to Mobil's interest during the relevant time period. Then Chevron sued Mobil, seeking an equitable remedy on the ground that Chevron had paid DOE for a liability that properly was Mobil's.

The United States District Court for the Western District of Texas ruled in Mobil's favor, citing an earlier 1979 Consent Order by which Mobil and DOE had settled all of DOE's assertions of Mobil's liability for the same pertinent time period. The 1979 Consent Order did not distinguish Mobil's liabilities as operator from those as interest owner. As the majority notes, the 1979 Consent Order plainly states that it resolves *all* of DOE's concerns with Mobil's past crude oil sales. Chevron had been given notice of Mobil's settlement with DOE, and Chevron's predecessor, Gulf, itself had settled with DOE on terms that distinguished operator from interest liability. When Chevron settled with

DOE, paying for Mobil's working interests in the East Waddell Ranch, Chevron did not assert, as it could have, that Mobil's liability had already been paid off under Mobil's 1979 Consent Order.

The district court realized, however, that notwithstanding the clear language of the 1979 Consent Order, that order could not have settled Mobil's liability for the East Waddell Ranch, if that liability as an interest holder had been subject to earlier litigation by the industry against DOE before Judge Theis in the United States District Court for the District of Kansas. The reason for a possible bar to inclusion of the East Waddell Ranch liability in the 1979 Consent Order is an injunction entered by Judge Theis in the Kansas case that precluded DOE from enforcing the law until certain legal matters were resolved. The injunction was in force when Mobil and DOE settled in 1979.

The district court in the present case concluded that the East Waddell Ranch property was "not a part of the Mobil litigation in Kansas." The reason for that holding is that Mobil did not pay any sums into the Kansas escrow on behalf of the East Waddell Ranch property (because Gulf made those payments on Mobil's behalf). Escrow payments in the Kansas suit were made only by operators, except in instances where operators refused to do so, in which case the working interest holders paid the escrow sums.

For Mobil's part in the Kansas suit, it obtained an injunction that precluded DOE from taking certain enforcement acts against it with respect to properties *operated* by Mobil. As noted above, Gulf/Chevron—not Mobil—operated the East Waddell Ranch property. The injunction on its face did not limit DOE's authority to seek money from Mobil on account of properties not operated by Mobil, but in which Mobil owned a working interest, such as the East Waddell Ranch. Because the East Waddell Ranch property was not involved in the Kansas suit insofar as *Mobil* was concerned (although it clearly was involved insofar as Gulf/Chevron was concerned), the district court in the present case held that the Kansas injunction presented no bar to the 1979 Consent Order between Mobil and DOE. Because that Order is plain on its face, settling *all* of Mobil's liability, the district court held that Chevron could take nothing from Mobil.

The majority appreciates the force of the 1979 Consent Order and the Kansas injunction that precluded DOE's settlement with Mobil only as to properties operated by Mobil. The majority thus recognizes that it cannot provide relief to Chevron unless it can conclude that the district court erred in saying that Mobil's responsibility for the East Waddell Ranch property was not involved in the Kansas litigation that produced the injunction against DOE enforcement activity.

To get over this seemingly insurmountable hurdle, the majority simply says "[h]owever, the Kansas litigation related to liability for working interests as well as operating interests." Maj. op. at 1254. Though true as far as it goes, this does not aid the majority. For the question is not whether some working interests were involved in the Kansas litigation, but whether *Mobil's* working interest in the East Waddell Ranch was involved in that litigation. Citing solid evidence to answer the question in the negative (no escrow deposit by Mobil for that property and an injunction against DOE that freed it to settle as to that property, and a subsequent settlement that eliminated all of Mobil's liability to DOE), the district court held that the East Waddell Ranch property was not subject to the Kansas litigation. Now the majority, not finding clear error by the

**1258**

district court in its key fact-finding, simply concludes otherwise.

I would affirm the district court for the reasons stated in its decision. Mobil's interest in the East Waddell Ranch property was not subject to the Kansas litigation; DOE and Mobil were free to settle Mobil's liability as to that property; DOE and Mobil did in fact settle; Chevron was aware of the settlement and could have used it in their own defense when they settled with DOE, but did not.