**JADE TRADING, LLC, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 03–2164T.**

United States Court of Federal Claims.

Aug. 30, 2005.

David D. Aughtry, Chamberlain, Hrdlicka, White, Williams & Martin, Atlanta, Georgia, and Linda S. Paine, Houston, Texas, for Plaintiffs.

Stuart J. Bassin, U.S. Department of Justice, Tax Division, Washington, D.C. for Defendant. Eileen J. O'Connor, Mildred L. Seidman, David Gustafson, William K. Drew, Matthew C. Hicks, Michael S. Raum, and Jennifer P. Wilson, U.S. Department of Justice, Tax Division, Of Counsel.

**ORDER GRANTING PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S SUMMARY CHART EXHIBITS**

WILLIAMS, Judge.

This matter is before the Court on Plaintiffs' motion to exclude Defendant's "summary chart" exhibits from trial on the grounds that they are untimely, unduly prejudicial, and violate Rule 1006 of the Federal Rules of Evidence (FED. R. EVID.).[1] Because the charts were not timely disclosed and the documents underlying these summary charts were not reasonably made available to Plaintiffs until July 30, 2005, well after the Court's order and rules dictated and roughly one month before trial, the Court excludes Defendant's Exhibit Nos. 691, 692, 693, and 694, from trial. Accordingly, Plaintiffs' motion is **GRANTED**.

### Background

On September 12, 2003, Plaintiffs filed this action under Section 6226 of the Internal Revenue Code challenging the Internal Revenue Service's (IRS) adjustment of their tax liability and assessment of penalties for 1999. In the Final Partnership Administrative Adjustment (FPAA) at issue, the IRS disallowed capital losses approximating $40,000,000 and assessed penalties of some $4,000,000, against the Ervin brothers, the real parties in interest.

Defendant contends that Jade was formed for the purpose of creating artificial tax losses intended to eliminate federal taxes on approximately $40 million in unrelated capital gains received by the Ervins in 1999. Plaintiffs counter that Jade Trading was a bona fide partnership, formed for the express purpose of making money from trading, and not with a principal purpose of reducing substantially the partners' aggregate federal tax liability.

The parties engaged in extensive discovery, which generated multiple disputes ne-

---

1. These summaries purport to present "evidence [that] consists of statistical reports analyzing the results of a review of documents relating to other similar transactions executed by clients of Sentinel Advisors and BDO Seidman." *See* Def.'s Br. at 1. Currently, this "pattern evidence" is the subject of Plaintiffs' "motion *in limine* to exclude unrelated non-party evidence." The parties have asked the Court to defer ruling on this motion *in limine* until trial.

cessitating intervention by this court.[2] Trial was originally scheduled to commence on June 6, 2005, then rescheduled to commence on July 25, 2005, over Plaintiffs' objection after Defendant moved for a continuance,[3] and again rescheduled to commence on September 6, 2005, at the request of nonparty witnesses.

The deadline for the exchange of exhibits was established in this Court's January 18, 2005, Amended Scheduling Order, which provided in part:

> 3. *Meeting of Counsel.* The parties shall meet to satisfy the requirements of RCFC Appendix A ¶ 13, including the exchange of exhibits and witness lists, and to stipulate to all matters as to which the parties agree, on or before **April 4, 2005.**

### Exhibits 691 and 693 (Formerly Designated Exhibit 1060)

Pursuant to the Amended Scheduling Order, on April 4, 2005, Plaintiffs sent Defendant ten binders of exhibits they intended to rely upon at trial, *see* Pls.' Suppl. Br. at 1, and Defendant sent an exhibit list to Plaintiffs, which included the following entry:

> Deft. Exh. No. 1060. Summary exhibits of data regarding other investors in Jade Son

of BOSS transactions (to be produced soon after production of BDO documents).[4]

*See* Def.'s Br. at Ex. 5; Pls.' Suppl. Br. at 1. Defendant did not tender any exhibits to Plaintiffs at this time. On April 19, 2005, Plaintiffs supplemented their exhibit list to include their expert reports and Defendant's supplemental responses to Plaintiffs' first requests for admission, which had been filed on April 14, 2005. Pls.' Suppl. Br. at 2 ¶ iv and Ex. A. On or about May 6, 2005, Plaintiffs again supplemented their proposed exhibit list with several recently discovered bank statements chronicling the fees paid by the Ervins. *See* Pls.' Br. at 2 and Ex. B. No objection to the supplement was received from Defendant. *See* Pls.' Suppl. Br. at 2 n. 3.

On May 10, 2005, Defendant first produced Exhibit Nos. 691 and 693, attached as Tabs A and B to its opposition to Plaintiffs' motion *in limine* on "pattern evidence." *See* Def.'s Br. at 3; Def.'s Opp. to Pls.' Mot. "Pattern Evidence," Ex. A, B.[5] These exhibits, coupled with Defendant's Exhibits 693 and 694, which were produced later, were substitutions for what had been Defendant's Exhibit 1060, which describe "summary exhibits" that were going "to be produced soon after production of BDO documents."

Defendant describes Exhibits 691 and 693 as follows: [6]

---

**2.** *See, e.g., Jade Trading LLC v. United States,* 65 Fed.Cl. 641 (2005), 65 Fed.Cl. 443 (2005), 65 Fed.Cl. 188 (2005), 65 Fed.Cl. 487 (2005), 64 Fed.Cl. 85 (2005); Orders dated Nov. 30, 2004, Dec. 2, 2004, Dec. 20, 2004, Dec. 29, 2004, Jan. 13, 2005, Mar. 23, 2005, May 13, 2005, May 17, 2005, May 19, 2005, May 26, 2005, Aug. 15.2005, and Tr. (Nov. 30, 2004).

**3.** *See* Pls.' Opp. To Def.'s Mot'n for Continuance of Trial. Subsequently, in order to resolve an outstanding discovery dispute involving documents Defendant withheld under the deliberative process privilege via an *in camera* review, the parties agreed to delay the trial until July.

**4.** However, as far as the Court can ascertain, Defendant did not ultimately identify any BDO documents as source documents for the summary charts.

**5.** On Apr. 22, 2005, Plaintiffs filed a motion in limine to exclude unrelated nonparty evidence, consisting of three categories of documents: "(1) incomplete material about the motives and conduct of 30–50 sets of unrelated people and enti-

ties (Defendant's so-called 'pattern evidence'), (2) unauthenticated papers that lack [adequate] foundation as to their creation or relevance to Jade Trading, LLC or the Ervins, and (3) witnesses who have already testified that they lack personal knowledge of Jade Trading, LLC, the Ervins, and the 276 transactions at issue." Pls.' Motion *In Limine* to Exclude Unrelated Non–Party Evidence and Memorandum of Law at 1. This motion *in limine* did not encompass Exhibits 691–694 because Defendant had not yet produced these exhibits to Plaintiffs. Rather, Exhibits 691 and 693 were first tendered to Plaintiffs as attachments to defendant's opposition to this motion *in limine.* Exhibit 694 was first produced to Plaintiffs on July 30, and Exhibit 692, on August 10 or 11, 2005.

**6.** Both parties reference the exhibits attached to the opposition to Plaintiffs' motion *in limine* on pattern evidence as Exhibits 691 and 692. However, the Court discovered that, in fact, Exhibits 691 and 693 (not 692) were attached to the opposition to the motion *in limine* on pattern evidence.

This case involves a tax shelter. The evidence at trial will show that the shelter ... was designed and marketed by BDO and Sentinel to individuals who anticipated large capital gains. The shelter operated by allowing taxpayers to claim an artificially high basis in a partnership through the purchase of foreign currency options and then prearranged contribution to, and withdrawal from, a "partnership." Based on this artificially high basis, the taxpayers claimed large capital gains on their income tax returns.

The Ervins contend that they engaged in the various steps of this transaction for economic reasons and that the claimed tax consequences were secondary. Our expert analysis will demonstrate that the steps the Ervins took here are inconsistent with market norms and are not well designed to produce economic benefits. The pattern evidence, in turn, shows that multiple taxpayers—all of them clients of BDO and Sentinel—took essentially identical steps to produce these same tax consequences without regard to economics. At Tabs A–B [Exhibits 691 and 693] we have attached summary charts illustrating portions of this evidence.... [T]hese few charts illustrate clearly the commonality one would expect to find among taxpayers who buy and execute identical, prearranged tax shelters:

1. The chart at [Exhibit 691] shows that the details of the trades were highly similar;

2. The chart at [Exhibit 693] shows that all of the taxpayers then contributed these options to a partnership under similar conditions; and

3. The chart at [Exhibit 693] also shows the highly similar conditions under which most of the taxpayers exited these partnerships.[7]

The ultimate question is whether the law supports plaintiff's proffered tax treatment. However, the fact that this case involves a mass-produced tax shelter is relevant to the Court's analysis and fatally undermines any claim of economic substance and business purpose. For all their talk of an investment plan, the Ervins purchased an off-the-shelf tax shelter and executed it as other purchasers did. The court should consider this pattern evidence, which shows that the transaction was designed, marketed, and executed to produce tax losses, not economic benefits.

Def.'s Opp. To Pls.' Mot'n *In Limine* "Pattern Evidence" at 2–3.

On its face, Exhibit 691 purports to summarize the average, high, and low for (1) the difference in strike price between the bought and sold options; (2) the notional amount (in Euro's) of the sold option and the notional amount for the bought option; (3) the difference in the notional amount between the sold option and the bought option; (4) the net premium paid to AIG (the difference in price between the bought and sold option) and this net premium as a percent of the premium (price) of the bought option; (5) and the maximum profit based on optimal exercise of the options less the net premium paid, the maximum profit as a percent of the notional strike price of the bought option, and the maximum profit as a percent of net premium. Defendant's Exhibit 693 is a two-page document entitled "Chart # 5/6" containing entries entitled "Parties who contributed options to a partnership" and "Length of time between acquisition Partnership Contribution" for 1999 and 2000. This exhibit bears the date "rev. 5/10/2005." Def.'s Opp. To Pls.' Mot'n to Exclude Summ. Charts, Ex. 3.

On or about May 17, 2005, Plaintiffs sent a letter to Defendant requesting identification of the underlying documents that were summarized in the charts first produced on May 10, 2005. *See* Pls.' Suppl. Br. at 2 ¶ vii and

---

7. The following footnote appeared at this point in Defendant's Brief:

The evidence will show other points as well. For example, it is expected to show that the majority of taxpayers entered into virtually identical investment advisory agreements with New Vista for which they paid large up-front fees, generally hundreds of thousands of dollars. The evidence will show that the taxpayers all paid fees to AIG above the premiums on the trades. We also expect the BDO evidence to show that those who exited the partnerships took large tax losses the same year roughly equal to the size of bought call premium.

Ex. D. The May 17, 2005, letter provided in part:

In the event the Court allows Defendant to introduce non-party evidence, please note that we will need the bates stamped numbers of the underlying documents that support the conclusions set forth in Defendant's charts that were attached to its Opposition to Plaintiffs' Motion *In Limine* ("Pattern Evidence").

*See* Pls.' Suppl. Br., Ex. D. On May 27, 2005, Defendant filed a revised exhibit list, which again included the identical description of Exhibit 1060, without providing a copy of any actual exhibit.[8] *See* Def.'s Ex. List at 3 (May 27, 2005). Apparently, in June 2005, there was a communication between Plaintiffs and Defendant in which Plaintiffs' counsel again requested the documents underlying the summary charts, and Defendant pointed them to the AIG and Sentinel documents comprising some 15,000 pages which had been produced by these third parties in September, 2004.

Plaintiffs state that the communication in June 2005, referred globally to all Sentinel and AIG documents, SEN 00001—SEN 05849 and AIG II 00001—AIG II 09849, as responsive to Plaintiffs' May 17, 2005 letter. *See* Pls.' Suppl. Br. at 3 n. 6. Plaintiffs contend "that the global response was calculated to defeat Defendant's obligation to identify the summarized documents." *Id.* Neither party can locate this communication. *See* Def.'s Br. at 3; Pls.' Br. at 3 n. 6.[9]

### Exhibit 692

Exhibit 692 depicts "those entities with consulting agreements," and purports to summarize the timing of the consulting agreements, the fees paid to the respective consultants, and the fees as a percentage of the premiums on the sold call options. Defendant did not represent when it first produced Exhibit 692 to Plaintiff, but Plaintiffs represented that this exhibit was not produced until August 10, 2005.[10]

### Exhibit 694

On July 30, 2005, Defendant sent a letter to Plaintiffs attaching a copy of Defendant's Exhibit 694, which purported to be a "key," identifying the source information underlying the summary charts in Defendant's Exhibit Nos. 691–693. *See* Pls.' Suppl. Br. at 2 ¶ x, Def.'s Br. at 3. Defendant's Exhibit No. 694 is a spreadsheet that lists various partnerships, including Jade Trading, Rainbow Trading, New Wave, LLC, Sapphire Traders, LLC, Agate Trading, LLC, Arbitrage Trading, LLC, Aventuri Trading, LLC, Crystal Trading, LLC, Delta Trading Opportunities, LLC, Eagle Trading Opportunities, LLC, Eclipse Trading, LLC, Evergreen Trading, LLC, FX Opportunities, LLC, Garnet Trading, LLC, Global Trading Strategies, LLC, Hawkseye Trading Opportunities, LLC, Maple Capital Investments, LLC, Mercury Trading Investments, LLC, New Century Traders, LLC, New Millennium Trading, LLC, Oak Leaf Trading, LLC, Oakridge Trading, LLC, Onyx Trading, LLC, Opal Trading, LLC, Pinnacle Trading Opportunities, LLC, Platinum Trading, LLC, Ruby Trading, LLC, Sequoia Capital Investments, Inc., Silver Investments, LLC, Starling Trading Opportunities, LLC, The Equinox

---

**8.** On June 16, 2005, Plaintiffs filed a "motion to exclude Defendant's 121 new exhibits first designated on May 27, 2005." Plaintiffs attached a chart to this motion providing specific evidentiary objections to the allegedly untimely exhibits. Plaintiffs objected to Defendant's Exhibit No. 1060 as "[i]rrelevant, lacking any foundation to establish relevance to Jade or the Ervins, and ... highly prejudicial as it seeks to summarize cherry-picked facts from 30–50 unrelated partnerships. Additionally, this exhibit was not produced prior to the close of discovery. Inadmissible under 401, 402, 403, 802, and 901." *See* Pls.' Mot'n To Exclude at Ex. 1.

**9.** On July 13, 2005, Plaintiffs notified Defendant that they would supplement their exhibit list to include supplemental rebuttal reports from two experts and Defendant did not object. *See* Pls.' Suppl. Br. at 2 ¶ ix and Ex. E.

**10.** Defendant asserts that it tendered Plaintiffs "duplicate" copies of Exs. 691–693 on Aug. 10, 2005, but there is no documentation in the record that Defendant ever tendered an "original" of Exhibit No. 692 prior to August 10, 2005. It appears that there were two faxes from Defendant to Plaintiffs, one of which was five pages and was sent on August 10, 2005, the other, four pages, sent on August 11, 2005. It appears that the August 11, 2005, fax only included two charts. *See* Pls.' Suppl. Mot'n, Ex. 6. The August 10, 2005, fax included three summary charts. *See* Def.'s Opp., Ex. 8.

Trading Fund, LLC, Tiger's Eye Trading, LLC, Topaz Trading, LLC, and Trading Opportunities Fund, LLC.

For each trading partnership listed, the spreadsheet in Exhibit 694 provides, where applicable, the investor-level entity or entities, the managing member, the value of the position contributed to the partnership, the investor's money contribution, the total contribution by each investor-level entity, the 1999 capital gain, amount realized, date realized, the trading counterparty, the account opening fee with that counterparty, the date of acquisition of the paired option, the instrument, the notional Euro amount, the premium paid on the option, the strike price of the option, and the expiration date of the option.[11] The spreadsheet also compares the paired options and lists the difference in expiration date, the difference in notional Euro amounts, the difference in strike price, the net premium paid, and the maximum gain that could have been realized on the paired option. Next, the spreadsheet lists the fee paid to Sentinel broken down by management fee and incentive fee. Similarly, the spreadsheet lists the fee paid to New Vista, indicating the agreement date, the amount paid, and presumably the end date of the agreement. The spreadsheet also lists the date of withdrawal from the partnership by the investor-level entity, indicating the date of withdrawal, the amount of Xerox stock received, the Euros received, and the number of days from the contribution to the partnership. Finally, the spreadsheet contains a space for the capital loss recognized and the date thereof, and that space only contains data for the Ervins—the capital loss blocks for all other partnerships are blank.

On August 24, 2005, Plaintiffs filed a motion to exclude Defendant's summary charts and nine new exhibits first designated on August 10, 2005. On August 24, 2005, the Court heard argument on Plaintiffs' motion to exclude Defendant's summary charts, Exhibits 691–694, and requested further briefing, which was timely filed on August 25, 2005.

Trial is scheduled for September 6–19, 2005, in Atlanta, Georgia.

### *Discussion*

■ The admission of summary charts is a matter within the trial court's discretion. *See United States v. Bray,* 139 F.3d 1104, 1109 (6th Cir.1998) (citing *United States v. Williams,* 952 F.2d 1504, 1519 (6th Cir.1991); *Fraser v. Major League Soccer,* 284 F.3d 47, 67 (1st Cir.2002)) ("It is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful."). Indeed, "[n]o federal rule is needed [ ] to empower a district judge to prevent a party from springing summaries of thousands of documents on the opposing party so late in the day that the party can't check their accuracy against the summarized documents before trial." *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745 (7th Cir.2005).

■ Rule 1006 of the FED. R. EVID. governs the admission of summaries of records. The Rule provides:

Rule 1006. Summaries

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

In *Conoco Inc. v. DOE,* 99 F.3d 387, 393 (Fed.Cir.1996), the Federal Circuit recognized that Rule 1006 permits the introduction of summaries of documents, but only if the records from which the summaries were prepared are admissible and are made available to the opposing party for examination or copying. *See generally, AFD Fund v. United States,* 61 Fed.Cl. 540, 546 (2004) ("A proponent of a summary of evidence must properly authenticate it by satisfying four requirements. First, the summarized writings must be so voluminous so as to be

---

11. The spreadsheet leaves various categories blank for the non-Jade entities. For example, under the heading "Xerox stock received," Jade Trading, LLC is the only trading partnership for which any information is provided.

unable to be conveniently examined in court. Second, the underlying evidence must itself be admissible. Third, the original or copies of the summarized writings must be made available to the opposing party. And, fourth, the proposed summary (or chart or calculation) must accurately summarize (or reflect) the underlying document(s) and only the underlying document(s)" (internal citations omitted)).

The Federal Circuit has noted that "the rules recognize that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents." *Conoco*, 99 F.3d at 393; *accord Air Safety, Inc. v. Roman Catholic Archbishop*, 94 F.3d 1, 7–9 (1st Cir.1996) (recognizing that under Rule 1006 a party has a "guaranteed access [to documents underlying a summary] designed to give the opponent the ability to check the summary's accuracy and prepare for cross-examination."); *United States v. Rangel*, 350 F.3d 648, 651 (7th Cir.2003) ("A 'reasonable time and place' [under FED. R. EVID. 1006] has been understood to be such that the opposing party has adequate time to examine the records to check the accuracy of the summary." (internal citations omitted)).

In *Air Safety*, the First Circuit upheld the trial court's exclusion of summary exhibits and explained the requisites for complying with Rule 1006's provision that the underlying materials in a proposed summary exhibit be "made available":

> [T]o satisfy the "made available" requirement, a party seeking to use a summary under Rule 1006 must identify its exhibit as such, provide a list or description of the documents supporting the exhibit, and state when and where they may be reviewed.

*Id.* at 8. Moreover, the Court of Appeals favorably cited the District Court's explication of the "made available" requirement:

> I don't think that it is enough to say that the documents have been available or could have been available or were available when they were not identified as the source for these summaries. What is important in the discovery context is one thing, but once the discovery comes down to trial and somebody prepares a summary, it seems to me that the person providing the summary must say now these documents, this summary, is a summary of the following documents, and here they are.

*Id.*

In sum, the First Circuit recognized a party's "absolute right to subsequent production of material under Rule 1006, should that material become incorporated in a chart, summary, or calculation" regardless of whether that material had been requested in discovery. *Air Safety*, 94 F.3d at 8 (internal citation omitted); *United States v. Modena*, 302 F.3d 626, 633 (6th Cir.2002).

Appendix A, ¶ 13 of this Court's Rules, expressly invoked in this Court's Scheduling Orders, further confirms that the underlying data being summarized must be made available. Paragraph 13 specifies procedures to be followed by parties intending to use summaries at trial in this forum:

> **13. Meeting of Counsel.** For cases to be resolved by trial, counsel for the parties shall meet no later than 63 days before the pretrial conference and accomplish the following:
>
> **(a) Exhibits.** Exchange a list of all exhibits (including summaries, *see* FED. R. EVID. 1006) to be used at trial for case-in-chief or rebuttal purposes, … Unless previously exchanged, counsel for the parties *shall* exchange a copy of each exhibit listed. In the case of exhibits to be offered as summaries under FED. R. EVID. 1006, the offering party *shall* provide opposing counsel with a statement with respect to each summary exhibit describing the source(s) for the items or figures listed (*e.g.,* ledgers, journals, payrolls, invoices, checks, time cards, etc.), the location(s) of the source(s), the time when the source(s) may be examined or audited by the opposing party, the name and address of the person(s) who prepared each summary and who will be made available to the opposing party during any examination or audit of the source material to provide information and explanations necessary for verification of the information in the sum-

mary. Failure to list an exhibit *shall* result, absent agreement of the parties or a showing of a compelling reason for the failure, in an exclusion of the exhibit at trial. (emphasis added).

This court expressly required the parties in this action to "satisfy the requirements of RCFC Appendix A, ¶ 13 in its January 18, 2005, January 10, 2005, June 15, 2004, and May 28, 2004, Scheduling Orders." Although Defendant first vaguely indicated its general intention to provide summaries analyzing non-party, "Jade-like" transactions on the deadline for exchanging exhibits, it did not timely exchange a copy of the summaries as required by RCFC Appendix A, ¶ 13. Nor did the description of the summaries disclose what non-party taxpayer information was going to be summarized. Nor did Defendant include this source material in any other trial exhibits.

Defendant did not provide any charts until May 10, 2005—over one month after the April 4, 2005, deadline, when it produced two charts in its opposition to Plaintiffs' motion *in limine*—without identifying the underlying documents on which they were based.

Despite Plaintiffs' request on May 17, 2005, that Defendant provide the documentary predicate for these two summary charts, Exhibit Nos. 691 and 693, Defendant failed to identify the underlying documents summarized in these exhibits until July 30, 2005,[12] a little over one month prior to trial. At that time, Defendant identified the underlying documents via another summary, Exhibit No. 694. This exhibit provided a breakdown of the listed entities' transactions, members, agreements, and withdrawal date by the investor-level entity from the partnership, and identified what appear to be some 430 documents as the sources from which the preparer of the chart derived the information for each entity.

For Plaintiffs to determine the accuracy of Exhibits 691–693, they would have to first check the veracity of the source documents provided in Exhibit 694, calculate possible profit potential on the paired options, as well as fee as a percentage of performance, among other calculations, and then analyze the information entity by entity to verify the ultimate purported conclusions in Exhibits 691–693. Thus, Plaintiffs would be required to conduct a two-step inquiry and calculations to test the summaries in Exhibits 691–694—by this Court's estimation, a painstaking undertaking, unnecessarily foisted upon Plaintiffs after the deadline and too close to the start of a demanding trial.[13]

In short, Defendant did not timely identify the sources for the items in the summaries as required by the Federal Rules of Evidence and this Court's rules. Nor has Defendant attempted to articulate a "compelling reason for its failure" to do so as required by RCFC Appendix A in order to avert exclusion.

### Conclusion

Exhibit Nos. 691–694 were tendered late and summarize voluminous documents that were not identified with any specificity until approximately one month before a complex two-week trial. Because Defendant's proffered summaries failed to comply with FED. R. EVID. 1006 and RCFC Appendix A, ¶ 13, they are excluded.

The Court defers ruling on the admissibility of Defendant's nine new exhibits allegedly first designated on August 11, 2005, until trial.

It is so **ORDERED**.

---

12. While both parties agree that there was some interim phantom communication that pointed Plaintiffs to AIG and Sentinel documents as the source for the charts, neither party can produce any correspondence. More importantly, the documents produced by AIG and Sentinel totaled roughly 15,698 pages, and reference to such a document dump without specifying which documents were being summarized does not begin to satisfy Rule 1006's "made available" require-

ment, or this Court's procedures in Appendix A ¶ 13.

13. In addition to presenting a case of first impression on substantive tax issues, this action involves complex option trading transactions and requires testimony by nine expert witnesses, including rebuttal experts, and roughly 25 lay witnesses, thousands of pages of trial exhibits, and at least two weeks of trial time.